**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

**HOPE WAGGONER and JAIME TORRES,**
**as individuals and on behalf of V.T., a minor,**

**Plaintiffs,**

**v.** **no. 3:25-cv-00166-RFC**

**JACOB TORRES,**

**Defendant.**

**DEFENDANT JACOB TORRES' MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY GROUNDS, AND FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' DAMAGES CLAIMS**

COMES NOW Defendant Jacob Torres, by and through his counsel of record, CARRILLO LAW FIRM, P.C. (Raúl A. Carrillo, Jr.), and urges this Court to enter judgment for Defendant Jacob Torres as follows:

## I. INTRODUCTION

In this matter Plaintiffs' Complaint against Defendant Jacob Torres ("Jacob"), in his individual capacity, alleges violations of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. §1983, and asserts claims under Texas law for false imprisonment, intentional infliction of emotional distress, tortious interference with parental rights, and negligence. *See* Plaintiff's Complaint [Doc.1] generally. Plaintiffs' claims arise from an incident that occurred on February 20, 2025. On the early morning hours of said date, Socorro (TX) Police Department ("SPD") Officers were dispatched regarding an alleged aggravated assault involving Plaintiff Jaime Torres ("Jaime"),[1] and one Natalia Figueroa ("Figueroa"). During investigation of the incident, SPD Officers made contact with Plaintiff Hope Waggoner ("Hope"). The officers determined that

[1] Jaime Torres is VT's alleged father.

Hope, then a sixteen (16) year old minor child, had been reported as a runaway out of the State of New Mexico, and detained her.[2] At the time Hope was detained, she had her three-month old infant, Plaintiff VT, with her. SPD transported Hope and VT to SPD's office. Thereafter, SPD reported to the New Mexico Children, Youth and Families' Statewide Central Intake ("SCI") hotline regarding the incident, and Hope's detention by SPD. *See* Ex. 2. Upon receipt of the report, SCI made contact with the Children, Youth and Families Department office in Dona Ana Couunty, Las Cruces, New Mexico ("CYFD"), which dispatched Jacob to SPD to retrieve Hope. The SCI Report noted that Hope had VT with her at SPD. Prior to leaving Las Cruces, Jacob consulted with his on-call supervisor, Claudia Cavazos ("Cavazos") regarding VT, because only Hope was in CYFD's legal custody. After discussion, the two agreed that Jacob would need to ask Hope whether Hope wanted VT to come back with her to New Mexico.

Jacob arrived at SPD at approximately 8:14 a.m., and made contact with Hope who still had VT in her physical custody. At the time Jacob arrived at SPD, Hope and VT had been at SPD for approximately six (6) hours. Upon contact with Hope, Jacob asked Hope whether she wanted to bring VT back to New Mexico with her; Hope said "yes, she would not be leaving without her baby." *See* Ex. 3. ¶ 25. Jacob contacted Cavazos and informed her Hope was going to be bringing VT with her, and that he, Hope and VT would be returning to New Mexico. During Jacob's initial interaction with Hope at SPD, Hope acknowledged that Jaime had been involved in a verbal altercation, but said that it was "stupid," and refused to expand. *Id.* ¶ 26. On the trip back to New Mexico, Hope told Jaime she would run away again, and return to El Paso, Texas at her earliest opportunity. *Id.* ¶ 40.

---

[2] On February 20, 2025, Hope was a minor child in the legal custody of CYFD. CYFD had placed Hope in A foster home, from which Hope had run away. *See* Ex. 1.

Upon arrival at CYFD, Jacob turned Hope over to Hannah Duron ("Duron"), Hope's CYFD Permanency Planning Worker, and in accordance with his statutory duty to investigate allegations of child abuse and/or neglect,[3] began investigating the events surrounding the incident in Socorro, Texas, that led to Hope's detention by SPD. When Hope went with Duron, Hope took VT with her. Throughout the trip from Socorro, TX to CYFD, and throughout Jacob's investigation, VT remained together with Hope.

During his investigation, Jacob spoke with Duron, and by phone with Figueroa and Jaime. The facts learned by Jacob, which are documented in Jacob's investigation notes, and in an Affidavit, led CYFD to make the decision to seek emergency physical and legal custody of VT. *See* Exs. 6 and 11. The Las Cruces Police Department ("LCPD") was contacted, and LCPD Officer Loya arrived at CYFD. At 7:07 p.m., on February 20, 2025, Officer Loya, pursuant to the authority granted to law enforcement officers by the New Mexico Children's Code ("NMCC"), placed VT in CYFD's custody. *See* Ex. 9; *see also*, NMSA 1978 § 32A-4-6.[4]

On February 25, 2025, and within the time limits set by the NMCC, CYFD, by and through its Children's Court Attorney ("CCA"), motioned the Third Judicial District Court of New Mexico for an *Ex Parte* Custody Order seeking placement of VT in CYFD custody. *See* Ex. 11; *see also*, NMSA 1978 § 32A-4-16, and § 32A-4-18 (C)(2) .[5] CYFD attached to its Motion

---

[3] *See* NMSA 1978 § 32A-4-3(C) (The recipient of a report that a child is an abused or a neglected child "shall take immediate steps to ensure prompt investigation of the report" and "shall ensure that immediate steps are taken to protect the health or welfare of the alleged abused or neglected child.")

[4] "A child may be held or taken into custody by a law enforcement officer when the officer has evidence giving rise to reasonable grounds to believe that the child is abused or neglected and that there is an immediate threat to the child's safety." *See* NMSA 1978 § 32A-4-6.

[5] At the time a petition is filed or any time thereafter, the children's court or the district court may issue an ex-parte custody order upon a sworn written statement of facts showing probable cause exists to believe that the child is abused or neglected and that custody under the criteria set forth in Section 32-4-16 [32A-4-18] NMSA 1978 is necessary. "[T]he child is in immediate danger from the child's surroundings and removal from those surroundings is necessary for the child's safety or well-being[.]"NMSA 1978 § 32A-4-18.

Jacob's affidavit verifying to the Court the facts found by Jacob's investigation. On February 26, 2025, the Court, pursuant to its temporary emergency jurisdiction, and upon a finding that probable cause existed to believe that a continuation of VT in Hope's and Jaime's home would be contrary to VT's welfare because Hope and Jaime had failed to maintain VT in a safe environment by involving the VT in domestic violence where the threat of serious harm or death existed, granted CYFD's Motion. Ex. 16; *see also,* NMSA 1978 § 40-10A-204.[6, 7]

## II. UNDISPUTED MATERIAL FACTS ("UMF")

1. On February 20, 2025, Hope was a sixteen (16) year-old minor in the legal custody of CYFD. Ex. 1.
2. On February 20, 2025, at 1:51 a.m. (MST),[8] SPD was dispatched regarding an incident wherein Jaime was alleged to have become involved in an argument with a Figueroa, a family member, pulled a knife on Figueroa, and swung it at her while the two struggled over a car seat which contained the infant, VT. Figueroa told Officers Jaime's conduct caused Figueroa to fear for her life. Ex. 5.
3. Figueroa advised SPD Officers that Jaime forced Hope, who Figueroa told the Officers was a runaway juvenile out of the State of New Mexico, into a vehicle, and then drove away. Ex. 5.
4. An SPD Officer located the involved vehicle, a tan Dodge Caravan ("van"), and conducted a "felony stop," took the occupants into custody, found and seized a knife

---

[6] "A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." NMSA 1978 § 40-10A-204.

[7] Concurrent with its Motion for Temporary Ex Parte Custody, CYFD's CCA filed a request for a hearing informing the Court that, pursuant to the NMCC, a hearing on the Motion needed to be on or before March 11, 2025. *See* Ex. 18; *see also*, NMSA 1978 § 32A-4-18(A).

[8] All times hereafter are MST.

consistent with the knife described by Figueroa, confirmed Hope's runaway status, and transported Hope and VT to SPD. Ex. 5.

5. On February 20, 2025, at 4:56 a.m. the New Mexico SCI hotline received a report ("SCI Report") from SPD Sgt. Aguirre regarding child abuse and/or neglect VT, a three (3) month-old infant, was the alleged to be the victim of physical neglect at the hands of Hope. Ex. 2; Ex. 3 at ¶¶ 11, and 13; Ex. 4, deposition of Jacob Torres (hereinafter "Ex. 4), at 76:1-14.

6. The SCI Report stemmed from the February 20, 2025, early morning an incident that SPD had been dispatched to investigate, wherein Jaime was alleged to have arrived at the home where Hope and VT had been staying with Figueroa, and upon arrival engaged in an argument with Figueroa while Figueroa was holding VT in a baby carrier/car seat, pulled a knife on Figueroa and swung it at her. Jaime thereafter forced Hope into the van in which he had arrived, and fled the scene. Ex. 2; Ex. 5.

7. On February 20, 2025, at 5:23 a.m. SCI notified Claudia Cavazos (sometimes spelled Cabasos in Exhibits) ("Cavazos"), an employee of CYFD, of the SCI Report. Ex. 2.

8. On February 20, 2025, Jacob was a Child Abuse and Neglect Investigator ("Investigator") for CYFD. Ex. 3 at ¶¶ 3-4; Ex. 4 at 29: 2-4.

9. On February 20, 2025, Jacob was the on-call Investigator for CYFD. Ex. 3 ¶ 9; Ex. 4 at 45:17-24.

10. On February 20, 2025, Cavazos contacted Jacob, and advised Jacob that Hope, who was on runaway status, had been picked up by SPD and was in Socorro, TX, and that Jacob needed to travel to SPD to pick-up Hope. Ex. 3 ¶¶ 11-12; Ex. 4 at 45:25, 46:1-2 and 7-1, 49:2-7, and 50:5-11.

11. Claudia Cavazos emailed a copy of the SCI Report to Jacob. Ex. 3 at ¶ 13; Ex. 4 at 46:15-23.

12. Jacob read the Report and travelled to the SPD to pick up Hope. Ex. 3 at ¶ 13; Ex. 4 at 47:16-23, and 55:18-23.

13. The Report informed Jacob that Hope had her three-month-old infant child, VT, with her at SPD, that the two of them had been at SPD for approximately six (6) hours and could no longer stay there, and that there was no current custody order in place regarding VT. Ex. 2; Ex. 3 ¶ at 14.

14. To date Hope and Jaime have no custody order in place regarding custody or conservatorship of VT. Ex. 15, Deposition of Hope Waggoner (hereinafter "Ex. 15") at 60:1-5.

15. When Jacob arrived at SPD, he made contact with Lorenza Elias ("Elias"), an SPD civilian employee Victim's Advocate, who took him to a room where Jacob met with Hope, and VT. Ex. 3 ¶¶ 16-17; Ex. 4 at 57:13-25, and 58:5-25; Ex. 14, Deposition of Lorenza Elias (hereinafter "Ex. 14") at 14:17-22.

16. Elias had been with Hope and VT inside the SPD offices for approximately one-half hour before Jacob arrived at SPD to pick-up Hope. Ex. 14 at 54:22-25, and 55:1-6.

17. During the time Elias was with Hope and VT, Elias did not observe anything about Hope that led Elias to believe Hope was incapable of expressing her wishes with regard to VT. Ex. 14 at 91:7-15.

18. Hope never asked Elias to take VT to VT's father, never expressed that Hope wanted VT to go with her father, or that Hope wanted VT to stay in El Paso, TX. Ex. 14 at 41:8-13, and 21-23.

19. Prior to arriving at SPD, Jacob had discussed the fact that Hope was the only person in CYFD's custody at that time, and that Jacob needed to ask Hope whether Hope wanted VT to come back to New Mexico with her. Ex. 3 ¶ 15; Ex. 4 at 59:1-8.
20. Jacob met with Hope at SPD, introduced himself, and asked Hope if she wanted to bring VT with her to New Mexico. Ex. 3 ¶ 24; Ex. 4 at 60:14-20, and 25, 61:1-3..
21. Hope told Jacob "yes, she would not be leaving without her baby." Ex. 3 ¶ 25; Ex. 4 at 63:4-13, 67:25-68:1-8; Ex. 12, Deposition of Abigail Cordova (hereinafter "Ex. 12"), at 19:12-22.
22. At the time Jacob met with Hope at SPD, Jacob had no knowledge, other than what was contained in the SCI Report, regarding the circumstances of why Hope had VT with her at SPD, Jacob just knew that she did. Ex. 3 ¶ 19.
23. Prior to Jacob's arrival at SPD, Jacob had not spoken with anyone, nor did Jacob speak with anyone while he was at SPD, including Elias, about the reasons why Hope had VT with her at SPD. Ex. 3 ¶ 20.
24. At no time during Jacob's contact with Hope, did Hope tell Jacob about any of her interactions with SPD Officers, or what any SPD Officer or employee had said to Hope. Ex. 3 ¶ 21.
25. At no time during Jacob's interactions with Hope at SPD, or on the trip back to New Mexico, did Hope ever mention Jaime's name or talk to Jacob about Jaime, except to tell Jacob that there had been an altercation between Jaime and Jaime's step-mom. Ex. 3 ¶ 22.

26. While at SPD, Jacob learned from Elias that Texas CPS had arrived at the SPD before Jacob had arrived, but left SPD after the SCI Report was made to New Mexico. Ex. 3 ¶ 23.
27. While at SPD, Jacob never physically touched VT. Ex. 3 ¶¶ 28-34.
28. While at SPD, Jacob never took physical possession of VT away from Hope. Ex. 3 ¶ 33.
29. While at SPD, Jacob did not see or speak with Jaime. Ex. 3 ¶ 34-35 and 55.
30. Hope never asked Jacob to leave VT in Texas with VT's father. Ex. 4 at 70:18-25, and 71:1.
31. While Elias was with Hope at SPD, Elias never had any interaction with Jaime, and Hope never contacted Jaime. Ex. 14 at 40:9-12, and 41:2-5
32. Jaime never went into the SPD building on February 20, 2025. Ex. 13, Deposition of Jaime Torres (hereinafter "Ex. 13") at 32:8-10.
33. Jaime was not at SPD when Jacob arrived to pick-up Hope. Ex. 3 ¶¶ 34-35; Ex. 13 at 32:19-25, and 33:1-4; Ex. 15 at 54:5-11, 22-25, and 55:1-4.
34. At no time while Jacob was at SPD did Jacob have any contact with any other appropriate adult who was available to take physical custody of VT prior to Jacob's, Hope's and VT's departure back to New Mexico. Ex. 3 at ¶ 35.
35. It would have been unsafe, and inappropriate for Jacob to transport Hope back to New Mexico, and leave VT unattended at SPD. Ex. 3 at ¶ 3
36. Jacob assisted the SPD Victim's Advocate with placing Hope's belongings in the trunk of Jacob's car, while Hope strapped VT's car seat into the back seat of the car. Ex. 3 ¶¶ 30-32; Ex. 4 at 67: 2-5, and 14-22).
37. Jacob did not separate VT from Hope at SPD. Ex. 3 ¶ 33.

38. Jacob did not separate VT from Hope during the drive from SPD to CYFD. Ex. 3 at ¶¶ 37-39 and 44; Ex. 4 at 67:14-22.
39. On the trip back to New Mexico, Hope told Jacob she would be going back to Texas the first chance she got. Ex. 3 at ¶ 40; Ex. 4 at 70:4-12; Ex. 6 at ¶ 2.
40. Hope had a history of running away from CYFD custody to live with Jaime. Ex. 3 ¶ 49; Ex. 6 at ¶ 3
41. When Jacob, Hope and VT arrived at CYFD, Jacob arranged for Hope to go with Duron, because Duron was going to have to find a placement for Hope. Ex. 3 at ¶ 42; Ex. 4 at 72:20-25, 73:3-6; Ex. 7 at 23:16-25-24:1.
42. After leaving Hope with Duron, Jacob began conducting his investigation into whether VT had been subjected by Hope to abuse or neglect. Ex. 3 ¶¶ 46-47; Ex. 4 at 76:15-25.
43. As part of his investigation, Jacob spoke with Duron and by phone with Figueroa, and Jaime. Ex. 3 at ¶¶ 49-56; Ex. 6 at ¶¶ 3-5; Ex. 4 at 78:11-16.
44. At 10:08 a.m. on February 20, 2025, Jacob spoke with Figueroa. Ex. 3 at 51; Ex. 6 at ¶ 4; Ex. 8, Deposition of Natalia Figueroa (hereinafter "Ex. 8") at 66:20-25.
45. Figueroa is the ex-same-sex-partner of Jaime's mother, has known Jaime from his infancy, and was involved in raising Jaime. Ex. 3 at 52; Ex. 6 at ¶ 4; Ex. 8 at 9:11-25, 10:1.
46. Figueroa told Jacob that on February 20, 2025, she was helping Hope into a van when Jaime came up to them and started a verbal argument. Jaime then pulled a knife, physically threatened Figueroa with it, and grabbed VT and physically tossed her into the van. Jaime grabbed Hope and forced her in to the van, then grabbed a stroller and forced

it into the van causing it to hit Hope, and then entered the van himself and left. Ex. 3 at ¶ 53; Ex. 6 at ¶ 4; Ex. 8 at 16:16-18:11.

47. Figueroa told Jacob and Duron that she has had conversations with Hope about Jaime physically assaulting Hope, and that Jaime physically assaulted Hope when Hope was pregnant. Ex. 3 at ¶ 54; Ex. 6 at ¶ 4; Ex. 8 at 13:25-16:14, 67:1-7.

48. Figueroa told Jacob that Jaime is mentally unstable, has been in and out of psychiatric hospitals, has a criminal history, and that she has concerns about Jaime being around her. Ex. 3 at ¶ 54; Ex. 6 at ¶ 4; Ex. 8 at 65:19-24,66:20-67:1-7.

49. On February 20, 2025 at 9:58 a.m., Jacob spoke with Duron about her experience with Hope, as Hope's CYFD Permanency Placement Worker. Ex. 3 at ¶ 49; Ex. 6 at ¶ 3.

50. Duron told Jacob she has not been able to work with Hope much because Hope is always on the run; constantly leaving New Mexico to stay with Jaime in El Paso, TX. Ex. 3 at ¶ 49; Ex. 6 at ¶ 3.

51. Duron told Jacob that she has heard from Hope that there were incidents of violence between Hope and Jaime, and Duron expressed her concerns of Jaime being around Hope and VT because of the violence, and about VT being with Hope when Hope flees. Ex. 3 at ¶ 50; Ex. 6 at ¶ 3; Ex. 7, Deposition of Hannah Duron ("Ex. 7"), at 17:8-25-18:1-19, and 19:12-25-20:1-7.

52. On February 20, 2025, Jacob discussed the findings of his investigation with his superiors at CYFD, including CYFD's CCA, and CYFD made the determination that there was reasonable grounds to believe that VT was in danger from her surroundings and removal was necessary to ensure VT's safety. Ex. 3 at ¶¶ 58-60.

53. On February 20, 2025, at 7:07 p.m., LCPD Ofc. Loya placed VT in the custody of CYFD. Ex. 9.

54. VT remained in the physical possession of Hope from the time Jacob first made contact with Hope at SPD, and until LCPD Ofc. Loya placed VT in CYFD custody. Ex. 3 at ¶¶ 30-33, 37-38, 41-45; Ex. 12, Deposition of Abigail Cordova (hereinafter "Ex. 12") at 29:23-25, and 30:1, and 12-22; Ex. 17 ¶¶ 6-40.

55. On the evening of February 20, 2025, Hope was placed with a foster family in Las Cruces, New Mexico, and on February 21, 2025, Hope again ran away to El Paso, Texas to be with Jaime. Ex. 6 at ¶ 10; Ex. 20.

56. The Third Judicial District Court of New Mexico's hours of operation are Monday through Friday from 8:00 a.m. to 4:00 p.m.[9]

57. On February 25, 2025, CYFD filed an Abuse and Neglect Petition and a Motion for *Ex Parte* Temporary Custody of VT. Ex. 10, and Ex. 11.

58. On February 25, 2025, CYFD filed a Request for Setting informing the Third Judicial District of New Mexico of the time limitations for hearing the Motion for *Ex Parte* Temporary Custody. Ex. 18.

59. On February 26, 2026, the Third Judicial District of New Mexico granted CYFD's Motion for *Ex Parte* Temporary Custody of VT. Ex. 16.

60. On March 26, 2025, the Third Judicial District Court entered an Order dismissing the Abuse and Neglect case against Hope and Jaime concerning VT for lack of jurisdiction because New Mexico was not VT's home state. Ex. 19.[10]

## III. LEGAL STANDARDS

---

[9] This fact is readily verifiable public knowledge and the Court can take judicial notice of this UMF.

[10] Although the Order was not filed until March 26, 2025, the Court ordered VT returned to Plaintiffs on March 20, 2025, immediately following the March 20, 2025, hearing. Ex. 19.

**A. QUALIFIED IMMUNITY**

Qualified immunity offers a shield against civil liability for government employees to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wernecke v. Garcia,* 591 F.3d 386, 392 (5th Cir. 2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* (quoting *Pearson v. Callahan*, 129 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the `objective legal reasonableness' of the action, assessed in light of the legal rules that were `clearly established' at the time it was taken." *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (quoting *Harlow*, 457 U.S. at 818-19, 102 S.Ct. 2727)).

The Supreme Court established a mandatory "two-step sequence for resolving government officials' qualified immunity claims." *Id.* (citing *Pearson,* 129 U.S. at 815). The courts must first consider whether "the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of [constitutional or] federal law." *Id.* (citing *Kinney v. Weaver,* 367 F.3d 337, 350 (5th Cir.2004)). The second question of the analysis is if a violation has been alleged, "whether the right was clearly established" at the time of the alleged government misconduct. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Regarding whether the right allegedly violated is "clearly established," "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that

what he is doing violates that right.'" *Id.* (citing *Kinney,* 367 F.3d at 349-50 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "The 'clearly established' standard does not mean that officials' conduct is protected by qualified immunity unless 'the very action in question has previously been held unlawful.'" *Id.* at 393 (citing *Kinney,* at 350 (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034)). "[W]hat 'clearly established' means ... depends largely 'upon the level of generality at which the relevant "legal rule" is to be identified.'" *Id.* (citing *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034). "[A]n official does not lose qualified immunity merely because a certain right is clearly established in the abstract." *Id.* (citing *Kinney,* 367 F.3d at 350). Officials should receive the protection of qualified immunity "unless the law is clear in the more particularized sense that reasonable officials should be 'on notice that their conduct is unlawful.'" *Id.* (quoting *Saucier,* 533 U.S. at 206, 121 S.Ct. 2151). The court's focus, for purposes of the "clearly established" analysis, should be on "fair warning": qualified immunity is unavailable "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* (quoting *Hope v. Pelzer,* 536 U.S. 730, 740, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

**B. SUMMARY JUDGMENT**

On a Motion for Summary Judgment on grounds of qualified immunity, the trial court must make two determinations: "first, whether 'a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law,' and second, whether "a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." *Id.*

at 391. In evaluating constitutional claims the court is to consider each claim independently. *See generally, Id.*

## IV. ARGUMENT

Plaintiffs make three constitutional claims: first, that Jacob violated VT's right under the Fourth Amendment to be free from unreasonable seizure, second, that Jacob violated all Plaintiffs' Fourteenth Amendment rights by removing VT from Hope's and Jaime's custody without due process of law, and third, that Jacob violated Hope's and Jaime's Fourteenth Amendment substantive due process rights to the care, custody and management of VT. *See* Doc. 61 at pg. 43 (Plaintiff's proposed jury instruction).

### A. VT's Fourth Amendment Claim

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const., Fourth Amendment. The right to be free from unreasonable seizure is a personal right belonging to VT. *See Romero v. Brown,* 937 F.3d 514 (5th Cir. 2019) (citing *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 427 (5th Cir. 2008) ("The ones who are seized, the children, may assert a Fourth Amendment claim (brought on their behalf by the parents)). VT claims that Jacob subjected her to an unreasonable seizure when Jacob transported VT from SPD back to New Mexico,[11] and that the unreasonable seizure continued until the Third Judicial District Court of New Mexico dismissed CYFD's Abuse and Neglect Petition, and returned VT to her parents on March 20, 2025.[12] The alleged seizure, however, requires analysis under the unique facts of the case, which place at issue three distinct time periods. First, the time period starting at or around 8:14 a.m. on February 20, 2025, when Jacob first began transporting Hope and VT from SPD back to CYFD. Second, the time period starting when CYFD obtained

---

[11] *See* Doc. 61 at pg. 43.

[12] The Court did not enter its order until March 26, 2025. See UMF 60, and Footnote 10.

custody of VT from LCPD Ofc. Loya, and third, the time period starting when the Third Judicial District Court granted CYFD temporary *ex parte* custody of VT. Each time period must be analyzed to determine whether Jacob is entitled to qualified immunity regarding the alleged unreasonable seizure.

**1. VT was not seized for Fourth Amendment purposes when Jacob transported VT from SPD to CYFD because at all times VT remained in the physical care and custody of Hope.**

The first part of the two-part qualified immunity analysis requires the Court to find that the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of constitutional law. *See Werneke,* 591 F.3d at 392. The Fifth Circuit has held since *Gates, supra*, that "the government may not seize a child from his or her parents absent a court order, parental consent, or exigent circumstances." *Gates,* 537 F. 3d at 429. Gates and its progeny, however, do not provide an appropriate framework for analysis of the facts in the instant case, because they all establish that a seizure occurs when a child is actually separated from the physical custody of the child's parent(s). *See Gates,* 537 F. 3d 404 (2008) (removal of thirteen children from their parents' home); *Wernecke v. Garcia,* 591 F.3d 386 (5th Cir. 2009) (removal of two boys from parents' home and placement in foster care); *Romero,* 937 F.3d 514 (5th Cir. 2019) (removal of seven children from parents' home and placement in foster care); *McMurry v. Brunner,* 21-50888, 2022 WL 17493708 (5th Cir. Dec. 7, 2022) (removal of 14 year-old child from parents home); *Banks v. Herbrich*, 90 F.4th 407 (5th Cir. 2024) (removal of a four-year-old child from the custody and care of his mother); and *McMurry v. Weaver,* 142 F.4th 292 (5th Cir. 2025) (removal of 14 year-old child from parents home). It is undisputed that Jacob never separated—*removed*—VT from Hope's actual physical care and custody

before, during or after Jacob's transport of VT from Texas to New Mexico. *See* UMFs 27-28, 36-38, and 54. VT was not placed with CYFD until 7:07 p.m. on February 20, 2025. UMF 53.

When Jacob first made contact with Hope, she was in an office at SPD. UMF 15. In that office, Jacob had a brief conversation with Hope during which Jacob asked Hope if she wanted to bring VT with her to New Mexico. UMF 20. Hope told Jacob "yes, she would not be leaving without her baby." UMF 21. During that brief visit, Jacob never took physical possession of VT, and never separated VT from Hope's physical custody. UMF 37. Jacob left the office, went outside and contacted his supervisor, Cavazos, to tell her that Hope wanted to bring VT with her back to New Mexico, and the three of them would be headed back to CYFD. Ex. 3 at ¶ 28. While Jacob remained outside SPD, Hope exited the building with VT, and Elias, a civilian—non-law enforcement officer—Victim's Advocate employee of SPD. UMF 36; see also, Ex. 3 at ¶ 29-30. Jacob opened the trunk of his car and helped Elias to place Hope's belongings therein, while Hope strapped VT's car seat into the back seat. UMF 36. Hope then entered the back seat with VT, and Jacob departed. Ex. 3 at ¶ 39. On the trip back to New Mexico, Jacob made one stop at Hope's request, to allow Hope to use the bathroom. Ex. 3 at ¶ 37. Although VT was briefly separated from Hope while Hope used the facilities, the separation was not at Jacob's request or command. Ex. 3 at ¶ 37-38. Hope returned to the vehicle, got back into the back seat of the car with VT, and the three proceeded to CYFD. Ex. 3 at ¶ 39. Upon arrival at CYFD, Hope took VT into the CYFD building, and Jacob turned Hope over to Hope's Permanency Planning worker, Hannah Duron; Hope took VT with her. UMF 41; Ex. 3 at 41. Jacob left Hope and VT and began conducting his investigation into whether VT had been abused and/or neglected. UMF 42; Ex. 3 at ¶¶ 46-48. From the point in time when Jacob left Hope with Duron, until LCPD Ofc. Loya placed VT with CYFD, Jacob did not

physically separate VT from Hope. UMF 54; Ex. 3 at ¶ 63. Moreover, throughout the entire trip, and until Jacob turned Hope over to Duron, Jacob never touched VT, and never separated VT from Hope's physical custody. UMF 54; Ex. 3 at ¶ 45. Without a facts supporting a physical separation of VT from Hope's physical care and custody, VT is unable to establish that Jacob's conduct would amount to a violation of VT's constitutional right to be free from unreasonable seizure. *See Werneke,* 591 F.3d at 392.

**2. VT's right was not clearly established at the time Jacob transported VT from SPD to New Mexico.**

Even if this Court were to find that the mere transportation of VT—without a physical separation from Hope—from Texas to New Mexico is sufficient to establish a seizure of VT, that right had not been clearly established in the Fifth Circuit as of February 20, 2025. *See Id.* (quoting *Saucier,* 533 U.S. at 201) ("[I]f a violation has been alleged, the court must then determine 'whether the right was clearly established" at the time of the alleged government misconduct'"). As previously noted, *supra*, as of February 20, 2025, all of the reported Fifth Circuit cases involving a protective services worker's seizure of children from their' parents involved the actual removal of children from their parents' physical custody. At that time, Jacob could not have known that transporting a three-month-old infant together with the infant's mother was an unlawful seizure. Thus, VT's right was not clearly established.

The protection afforded by qualified immunity should not be lost merely because the right is "clearly established in the abstract." *Id.* at 393 (quoting *Kinney,* 367 F.3d at 350.) The law must be "clear in the more particularized sense that reasonable officials should be 'on notice that their conduct is unlawful.'" *Id.* (citing *Kinney,* 367 F.3d at 350, quoting *Saucier,* 533 U.S. at 206). It is undisputed that when Jacob made contact with Hope at SPD, Hope and VT had been together at SPD for approximately six (6) hours, and that during that lengthy period, Hope had

not relinquished VT to another, or made arrangements for some other appropriate caretaker to come to SPD and take VT. UMFs 13, 18, 31-33. It is undisputed that Texas CPS workers had come to SPD prior to Jacob's arrival and left when they had been informed that a report had been made with New Mexico. UMF 26. It is also undisputed that that Hope and VT could no longer stay at SPD, that VT, at three-months of age, was incapable of taking care of herself, and that it would be highly inappropriate and patently unsafe for Jacob to leave VT at SPD unsupervised. UMF 13, and 35. Most importantly, it is undisputed that when Jacob arrived to pick-up Hope, no other appropriate, adult caregiver was available at SPD with whom VT could have been left. UMF 29, 32, 33-34. Jacob, without any knowledge of the circumstances regarding why VT was still with Hope at SPD, or the interactions between Hope and SPD prior to his arrival, was placed in the untenable situation of having to ensure VT's safety while fulfilling his obligation to return Hope—*who had voluntarily, and unlawfully run away from her CYFD placement*—to New Mexico. See UMFs 22-24. Faced with these circumstances, Jacob did nothing but maintain the *status quo*; he kept VT with VT's primary caretaker, with whom she had been for the previous six-plus hours. Jacob's conduct was inherently reasonable under the circumstances, and clearly, there was no established right for VT to be separated from her mother, especially since separation under the circumstances would have resulted in simply leaving VT at SPD without proper supervision and care, placing VT at grave risk. Jacob's conduct actually prevented the removal of VT from her mother's care; the exact opposite of a seizure under the clearly established Fifth Circuit law. The alleged intrusion on VT's Fourth Amendment interests, pales in comparison to Jacob's interest in assuring VT's safety. *See Werneke,* 591 F.3d at 397 (citing *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (quoting *United States v. Place*, 462 U.S. at 703, 103 S.Ct. 2637). ("To determine the constitutionality of a seizure 'we

must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" Jacob's conduct was objectively reasonable in the face of no clearly established right, and Jacob is entitled to qualified immunity.

**B. Hope's and Jaime's Fourteenth Amendment Claims.**

**1. Procedural Due Process Claims.**

Hope's and Jaime's ("Plaintiffs') procedural due process claims are subject to the same procedures as VT's Fourth Amendment seizure claim. *See Gates,* 537 F. 3d at 435 ("The procedures required for a constitutional search and seizure under the Fourth Amendment are adequate to protect . . . procedural due process rights.") Jacob incorporates his arguments in sections IV(A)(1-2) (above) that VT was never seized by Jacob's transport of VT from Texas to New Mexico, and that if the transport was a seizure, Jacob is entitled to qualified immunity because the law regarding that alleged seizure was not clearly established at the time of his actions.

**2. Substantive Due Process.**

"The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious than property rights." *Romero,* 937 F.3d at 519 (quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). "Yet as strong as the 'right of the family to remain together without the coercive interference of the awesome power of the state' is, the state also has a strong interest in preventing child abuse.'" *Id.* at 520 (citing *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988) (quoting *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977)). "So in a substantive due process analysis, '[t]he right to family integrity must be balanced against the state's interests in protecting the health,

safety, and welfare of children.'" *Id.* (quoting *Wooley v. Baton Rouge*, 211 F.3d 913, 924 (5th Cir. 2000)). This Court's analysis of Plaintiffs' substantive due process claim must place the claim "on a case by case basis, along a continuum between the state's clear interest in protecting children and a family's clear interest in privacy." *Id.* (quoting *Morris v. Dearborne*, 181 F.3d 657, 665 (5th Cir. 1999)). "If the facts of the case 'place it in the center of the continuum,' meaning the state's and family's interests overlap, the right to family integrity is considered too 'nebulous' to find a clearly established violation." *Id.* The defeat of a family integrity claim rests in large part on the degree of fit between the facts of this case, and the Fifth Circuit's prior opinions. *Id.*

As set forth above, Jacob's transportation of VT from Texas to New Mexico while VT remained in the physical custody and care of her mother, was not a seizure at all. Likewise, VT's continued physical presence with Hope while other CYFD employees attempted to find placement for Hope, was not a seizure of VT. The undisputed facts establish that VT was never removed from Hope's physical custody from the time Jacob initially began transporting Hope and VT until the evening of February 20, 2025, when VT was removed upon LCPD's—not Jacob's—determination that exigent circumstances supported removal. But even if this Court were to find that VT was seized during that time period, VT was never physically separated from Hope, and that important fact establishes that Jacob did not interfere with the Plaintiffs' right to family integrity.

It is undisputed that prior to travelling to SPD to retrieve Hope, Jacob had received and read the SCI Report alleging VT was the victim of neglect. UMF 13. It is undisputed that Jacob had a statutory duty to investigate the allegations of neglect made in the SCI Report. UMF 42; Ex. 3 ¶¶ 46-47. Further, it is undisputed that following Jacob's discussion with Figueroa, Jacob

learned of substantive first-hand information supporting both Jaime's child abuse against VT, and domestic violence against Hope on February 20, 2025, as well as Jaime's history of domestic violence against Hope. *See* UMFs 46-47.

In *Romero*, the Fifth Circuit Court of Appeals addressed parents' substantive due process claims in the context of an ongoing domestic violence investigation by Family and Protective Services. *Romero,* 937 F.3d 514. There, husband/father had been accused of "punching" and "body slamming" wife/mother. *Id.* at 518. Protective services opened an investigation and "ordered" husband to move out of the home, and to enroll in parenting, domestic violence, and anger management classes. *Id.* Several months later a protective services worker visited mother at the home and disparaged mother's financial condition, and criticized mother for having her 15-year-old son babysit the younger children. *Id*. The next morning the worker, without a court order, seized mother's three children from her physical custody, and an hour later seized mother's other four children at their school. *Id.* at 518-519. The following day, a state court held a hearing to determine if the warrantless removal was justified. *Id.* The court found no evidence of physical abuse, malnourishment, or medical neglect, ordered the children returned to the home, and allowed husband/father to return to the home as well. *Id.* The parents filed suit alleging, *inter alia*, violation of their substantive due process rights. *Id.* at 518. The court held that the worker was entitled to qualified immunity, concluding that the parents had not alleged "a violation of clearly established substantive due process rights because there was an ongoing investigation into domestic violence and the removal lasted only 24 hours." *Id.* at 518.

Importantly, the *Romero* court cited to *Kiser v. Garrett*, 67 F.3d 1166, 1173 (5th Cir. 1995), for the proposition that the Fifth Circuit has *never* found a violation of the right to family integrity in any case against a child welfare worker. *Romero,* 937 F.3d at 520. In *Kayser*, child

welfare workers investigated plaintiff on allegations of child abuse of plaintiff's then ten-week-old son, who had suffered a fractured arm, and a leg injury. *Kiser*, 67 F.3d at 1167. Following a six-month investigation, the child was returned to plaintiff's home after no final determination was made regarding who was responsible for the child's injuries. *Id.* at 1169. Plaintiff maintained that the child welfare workers had become aware through their investigation that plaintiff could not have caused the child's injuries, and that the injuries were most likely to have occurred while the child was in the physical control of another, and contended that the workers' actions in maintaining custody of plaintiff's child, and continuing their investigation after it had revealed exculpatory evidence exonerating plaintiff violated plaintiff's substantive due process rights. *Id.* at 1170-1171. The court found that "although a substantive due process right to family integrity has been recognized, the contours of that right are not well-defined, and continue to be nebulous, especially in the context of a state's taking temporary custody of a child during an investigation of possible parental abuse." *Id.* at 1173. The Court held that the workers were entitled to qualified immunity. *Id.* at 1173.

Given Jacob's discovery during his investigation of both domestic violence and child abuse, Jacob had a strong interest in protecting VT from further abuse. Jacob's interests, at an absolute minimum, overlaps with Plaintiffs' family integrity interests. As a result, Plaintiffs' right to family integrity is too nebulous to find a clearly established violation of that right, by any of Jacob's conduct. *Romero,* 937 F.3d at 520 (citing *Morris v. Dearborne*, 181 F.3d 657, 671 (5th Cir. 1999) ("If the facts of the case 'place it in the center of the continuum,' meaning the state's and family's interests overlap, the right to family integrity is considered too 'nebulous' to find a clearly established violation.") Jacob is entitled to qualified immunity as to Plaintiffs' substantive due process claims.

### C. Partial Summary Judgment as to all Plaintiffs' Damages

Even if this Court finds that Jacob is not entitled to qualified immunity regarding VT's Fourth Amendment seizure claim, and Plaintiffs' procedural and substantive due process claims, as those claims related to Jacob's transportation of VT from Texas to New Mexico, by 7:07 p.m., on February 20, 2025, Jacob's investigation had reached the point where exigent circumstances justified VT's removal from Plaintiffs' home. As a result, Jacob is entitled to qualified immunity from any liability for damages allegedly incurred after 7:07 p.m., on February 20, 2025.

1. **Based upon the totality of the circumstances, CYFD's seizure of VT at 7:07 p.m. on February 20, 2025, was based upon reasonable cause to believe VT was in imminent danger of physical abuse if VT were to remain in the custody of Hope and/or Jaime.**

As noted, *supra,* the government may seize a child from his or her parents if the seizure is based upon exigent circumstances. *Wernecke,* 591 F.3d. at 397 (citing *Gates,* 537 F.3d at 429). In the Fifth Circuit exigent circumstances is defined to mean "that, based on the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse if he remains in his home." *Id.* The analysis of exigent circumstances is "a flexible inquiry that considers all of the facts and circumstances with no one factor being dispositive." *Id.* at 397-398. Non-exclusive factors include:

> whether there was time to obtain a court order ...[,] the nature of the abuse (its severity, duration, and frequency), the strength of the evidence supporting the allegations of abuse, the risk that the parent will flee with the child, the possibility of less extreme solutions to the problem, and any harm to the child that might result from the removal.

*Id.* at 398.

At 10:08 a.m. on February 20, 2025, Jacob spoke with Figueroa. UMF 44. Figueroa is the ex-same-sex-partner of Jaime's mother, has known Jaime from his infancy, and was involved in raising Jaime. UMF 45. Figueroa told Jacob that on February 20, 2025, she was helping Hope into a van when Jaime came up to them and started a verbal argument. UMF 46. Jaime then pulled a knife, physically

threatened Figueroa with it, and grabbed VT and physically tossed her into the van. *Id.* Jaime grabbed Hope and forced her in to the van, then grabbed a stroller and forced it into the van causing it to hit Hope, and then entered the van himself and left. *Id.* Figueroa further told Jacob that she has had conversations with Hope about Jaime physically assaulting Hope, and that Jaime physically assaulted Hope when Hope was pregnant. UMF 47. Finally, Figueroa told Jacob that Jaime is mentally unstable, has been in and out of psychiatric hospitals, has a criminal history, and that she has concerns about Jaime being around her. UMF 48.

At 9:58 a.m., on February 20, 2025, Jacob spoke with Duron about Duron's experience with Hope, as Hope's CYFD Permanency Placement Worker. UMF 49. Duron told Jacob she has not been able to work with Hope much because Hope is always on the run; constantly leaving New Mexico to stay with Jaime in El Paso, TX. UMF 50. Duron further told Jacob that she has heard from Hope that there were incidents of violence between Hope and Jaime, and Duron expressed her concerns of Jaime being around Hope and VT because of the violence, and about VT being with Hope when Hope flees. UMF 51.

At 10:59 a.m., on February 20, 2025, Jacob spoke by phone with Jaime. This was Jacob's first contact with Jaime. Ex. 3 at ¶ 55. Jaime denied any violence *vis a vis* Figueroa, and that he had used a weapon, but refused to provide any other information. *Id.* at 56. Importantly, during their conversation, Jaime never asked Jacob about Hope or VT, and never requested that VT be released to him.

At approximately 1:00 p.m. on February 20, 2025, Hope and VT were taken to the Memorial Medical Center (MMC) in Las Cruces, NM by CYFD workers Abigail Cordova (Cordova), and Alyssa Noriega (Noriega) to have VT examined given Figueroa's report that VT was thrown into the vehicle by Jaime. Ex. 17. Hope did not object to VT's examination. *Id.* Hope, VT, Cordova and Noriega did not return to CYFD until approximately 7:00 p.m. *Id.*

Later on February 20, 2025, Jacob discussed the findings of his investigation with his superiors at CYFD, including CYFD's CCA, and at approximately and CYFD summoned LCPD, to discuss the status of VT. LCPD dispatched Officer Loya to CYFD, who took custody of VT and placed VT with CYFD's Protective Services Division. UMFs 52-53. Ofc. Loya's decision was based upon his belief that VT was in danger from her surroundings and removal from those surroundings was necessary to ensure VT's safety, and is documented in a Statement of Reasonable Grounds. UMF 53; Ex. 9.

The facts developed by Jacob during his investigation support his reasonable belief that VT was in imminent danger of physical abuse if she remained in Hope's—or Jaime's—home. Jaime's act of assaulting Figueroa with a knife while Figueroa was physically holding VT, and grabbing VT's car seat and throwing it—*with VT in it*—into the van placed VT at serious risk of physical harm. Jaime's history of abuse toward Hope, including while she was pregnant with VT, together with Jaime's February 20, 2025, abusive acts of grabbing Hope and forcing her into the van, and hitting Hope with a stroller, indicate Jaime's ongoing propensity for child abuse. *See Romero*, 937 F.3d at 521 (citing CHILD ABUSE & NEGLECT: RISK AND PROTECTIVE FACTORS, https://www.cdc.gov/child-abuse-neglect/risk-factors/index.html ("listing 'intimate partner violence' as a risk factor for child abuse and neglect)). Hope's minimization of Jaime's behavior on the morning of February 20, 2025, and Jaime's refusal to answer legitimate questions regarding his actions, evidence a substantial likelihood that the behavior would continue. Hope's established history of fleeing CYFD's lawful custody to return to El Paso, TX to be with Jaime, and in particular, Hope's statement to Jacob on the trip from Texas to New Mexico that Hope was going to run away and go back to Texas the first chance she got, evidence a significant risk that Hope would flee with VT if VT remained in Hope's custody. *See* UMFs

39-40, and 55. The evidence supporting these allegations is substantial, and is based upon the first-hand accounts of Figueroa, and Duron, persons with actual knowledge. By the time Hope and VT returned from MMC, the Third Judicial District Court was closed, and CYFD was unable to move the court for an *ex parte* custody order. UMF 56. Moreover, when CYFD did move the court for custody of VT, the court did not issue its order until the next day. UMFs 56-57. Finally, any harm to VT that might have resulted from her removal on February 20, 2025, was minimal, and in any event, far less than the threat VT faced if not removed. The factors to be considered in the "flexible inquiry" endorsed by the *Gates* Court, all weigh in favor of a finding that at the time CYFD was granted custody of VT by LCPD, exigent circumstances existed supporting VT's removal. As a result, Jacob is entitled to qualified immunity for whatever part Jacob's investigation played in CYFD's decision to remove VT, and Jacob is not liable for any alleged damages potentially incurred thereafter.

**2. Even if this Court were to find that exigent circumstances did not support the removal of VT from her parents' custody, the independent decision of the Third Judicial District Court that probable cause existed to support VT's removal breaks the causal chain related to any alleged constitutional violation.**

In *Hand v. Gary*, the Court held that "an officer who acted with malice in procuring the warrant or the indictment will not be liable if the facts supporting the warrant or indictment are put before an impartial intermediary such as a magistrate or a grand jury, for that intermediary's independent decision breaks the causal chain and insulates the initiating party." *See Taylor v. Gregg,* 36 F.3d 453, 456 (5th Cir. 1994), overruled on other grounds by *Castellano v. Fragozo,* 352 F.3d 939 (5th Cir. 2003) (en banc) (citing *Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir.1988)); *see also, Buehler v. City of Austin/Austin Police Dep't.*, 824 F.3d 548, 554 (2016). The proposition has become known as the independent intermediary doctrine. *See McMurry V. Brunner,* 2022 WL 17493708 * 3. Applied to the facts of the instant case, the Third Judicial

District Court's independent determination that probable cause existed to support the removal of VT, and its issuance of an order granting CYFD temporary custody of VT, breaks the causal chain, and ratifies the reasonableness of Jacob's actions. *See* UMF 57. The doctrine shields Jacob from liability provided the facts known to Jacob at the time CYFD made the decision to remove VT, were the same facts presented to the Court. Importantly, the doctrine applies even if the independent determination occurs after CYFD acted to remove VT, and even if no ultimate finding of abuse or neglect occurs. *See Buehler,* 824 F.3d at 554.

On February 25, 2025, CYFD filed a Motion for Ex Parte Custody Order requesting temporary custody of VT pending final adjudication of CYFD's Abuse and Neglect Petition ("Motion"). UMF 57. As support for the Motion, CYFD attached an affidavit drafted by Jacob. *Id.* The affidavit provided the court with the same operative facts known to Jacob when CYFD was granted custody of VT by LCPD. *Cf.* Ex. 6 and Ex. 11; *see also*, Ex. 3 at ¶ 60, and Ex. 2. The court granted CYFD's Motion on February 26, 2025, finding probable cause existed for VT's removal. The court's independent decision that probable cause existed for VT's removal on the evening of February 20, 2025, breaks the causal chain, absolving Jacob of liability for damages caused by any acts subsequent to LCPD's grant of custody to CYFD at 7:07 p.m. on February 20, 2025.

**3. Even if this Court finds that the independent intermediary doctrine does not shield Jacob from liability for acts subsequent to the Third Judicial District Court's finding of probable cause, Plaintiffs' damages should be limited to the time period between VT's initial seizure until the Court made a finding of probable cause.**

In *Martinez*, the court addressed a limitation on plaintiff's damages in plaintiff's suit under 42 U.S.C. § 1983 against the City of Chicago and several of its police officers for false arrest and unlawful search. *Martin v. Martinez,* 934 F.3d 594, 596 (7th Cir. 2019). Plaintiff was

pulled over, subsequently arrested and charged with several offenses based upon a handgun and cocaine discovered in plaintiff's car following the stop. *Id.* Prior to trial, plaintiff moved to suppress the evidence on grounds that the stop was illegal. *Id.* at 596-597. The court granted the motion, and the state dismissed the charges. *Id.* at 597. As a result of the arrest and charges, plaintiff spent sixty-five (65) days in jail. *Id.* at 596. Following dismissal, plaintiff sued seeking money damages for violations of his Fourth Amendment Rights. On motion for partial summary judgment, defendants argued that even if the stop was unlawful, once the officers found the handgun and cocaine, they had probable cause for plaintiff's arrest, which limited plaintiff's damages to the short period between the stop and the arrest. The trial court granted the motion, and instructed the jury that "if they found that [plaintiff] proved his claims, they could not award him damages for any time spent in custody after officers found the handgun, and should limit their consideration to the period of detention beginning with his traffic stop and ending when they found the gun." *Id.* at 597. On appeal, the trial court's decision was affirmed.

Here, Plaintiffs assert damages from the time Jacob began transporting VT from Texas to New Mexico, up and until VT was returned to Plaintiffs' on March 20, 2025,[13] following the Third Judicial District Court's dismissal of CYFD's Abuse and Neglect Petition, a period of 28 days. *See* UMF 60. If this Court does not grant Jacob's Motion in its entirety, and only finds that Jacob is entitled to qualified immunity beginning at the time exigent circumstances supported VT's removal—7:07 p.m., February 20, 2025—Plaintiffs damages should be limited to that ten (10) hour and fifty-three (53) minute time period. Damages for that period will be tailored to the interest protected by the particular right in question. *See Id.* at 599 (quoting *Carey v. Piphus,* 435 U.S. 247, 258-259, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)) ("to further the purpose

[13] See UMF 60, and Footnote 10.

of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interest protected by the particular right in question—just as the common-law rules of damages themselves were defined by the interests protected in the various branches of tort law.")

If this Court finds that Jacob is not entitled to qualified immunity for the first or second time-periods—beginning of transport until the Third Judicial District Court granted CYFD's Motion for *Ex Parte* Temporary Custody on February 26, 2025—Plaintiffs' damages should clearly be limited thereafter. That court's independent determination that probable cause existed for VT's removal should without question cut off Plaintiffs' damages at the time the order was entered. At the very least Plaintiffs' damages should be limited to six (6) days.

**WHEREFORE,** Defendant, Jacob Torres, respectfully requests that the Court FIND:

1. Jacob's transport of VT from Texas to New Mexico was not a seizure; and
2. If Jacob's transport of VT from Texas to New Mexico was a seizure, the law regarding whether such transport was an unreasonable under the circumstances was not clearly established on February 20, 2025, and that Jacob is entitled to qualified immunity regarding VT's Fourth Amendment seizure claim, and Plaintiffs' Fourteenth Amendment due process claims;
3. *In the alternative,* if Jacob is not entitled to qualified immunity related to VT's transport from Texas to New Mexico;
    a. Jacob is entitled to qualified immunity regarding VT's Fourth Amendment seizure claim, and Plaintiffs' Fourteenth Amendment due process claims, beginning at 7:07 p.m. on February 20, 2025, because exigent circumstances existed at that time to support VT's removal; and

b. All Plaintiffs' damages on all claims should be limited to that ten (10) hour and fifty-three (53) minute time period beginning when Jacob first began transporting VT from Texas to New Mexico, and ending at 7:07 p.m. on February 20, 2025;

4. *In the alternative,* if Jacob is not entitled to qualified immunity as set forth above, the Court should FIND:

   a. that Jacob is not the cause of any Plaintiffs' damages incurred after February 26, 2025, because the causal link has been broken under the independent intermediary doctrine; and

   b. Plaintiffs' damages should be limited to that six (6) day time period beginning when Jacob first began transporting VT from Texas to New Mexico, and ending when the Third Judicial District Court granted CYFD's Motion for Ex Parte Temporary Custody on February 26, 2025;

5. *In the alternative,* if Jacob is not entitled to qualified immunity as set forth above, and the causal link has not been broken by the independent intermediary doctrine, the Court should limit Plaintiffs damages to the time-period beginning when Jacob first began transporting VT from Texas to New Mexico, and ending when the Third Judicial District Court entered its Order Granting Ex Parte Custody to CYFD on February 26, 2025; six (6) days.

6. Jacob is entitled to qualified immunity on Plaintiffs' substantive due process claims.

7. If the Court finds that Jacob is entitled to qualified immunity on Plaintiffs' claims brought pursuant to 42 U.S.C. §1983, there exists no basis for the exercise of supplemental jurisdiction over Plaintiffs' state law claims, and the Court should dismiss Plaintiffs' claims for false imprisonment, intentional infliction of emotional distress, tortious interference with custodial relationship, and negligence.

Respectfully submitted,

**CARRILLO LAW FIRM, P.C.**

*/s/ Raúl A. Carrillo, Jr.*
Raúl A. Carrillo, Jr., NM Bar No. 5600
P.O. Box 457
Las Cruces, NM 88004
(575) 647-3200
(575) 647-1463 (fax)
raul@carrillolaw.org
*Attorney for Defendant Jacob Torres*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 8th day of September 2026, I caused the foregoing to be served and filed electronically through the CM/ECF electronic filing system, which caused all parties or counsel to be served by electronic means.

*/s/ Raúl A. Carrillo, Jr.*
Raúl A. Carrillo, Jr.