EXHIBIT 8



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

HOPE WAGGONER and JAMIE TORRES, as individuals and on behalf of V.T., a minor,

Plaintiffs,

v. NO. 3:25-cv-00166-RFC

THE NEW MEXICO CHILDREN, YOUTH & FAMILIES DEPARTMENT and JACOB TORRES, in his individual capacity,

Defendants.

-----------------------------------

ORAL DEPOSITION OF

NATALIA YURIBINA FIGUEROA

August 5, 2026

(REMOTELY REPORTED)

-----------------------------------

The Oral deposition of NATALIA YURIBINA FIGUEROA, produced as a witness at the instance of the defendants, and duly sworn, was taken in the above-styled and numbered cause on the 5th of August, 2026 from 1:12 p.m. to 2:31 p.m., in and for the State of Texas, reported by machine shorthand, conducted remotely, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

THE REPORTER: Good afternoon. Today's date is August 5, 2026. The time is 1:12 p.m. My name is Angelina Ontiveros, stenographic reporter. I am reporting the deposition remotely by stenographic means.

Will all persons present please state their appearance and whom they represent.

MR. CARRILLO: This is Raul Carrillo. I'm taking the deposition today. And I represent Mr. Jacob Torres, an investigator with the State of New Mexico Children, Youth and Families Department.

MR. WALDO: This is Curtis Waldo, I represent plaintiffs in the case.

MR. ROMERO: This is Ray Romero, I'm Mr. Carrillo's law partner, same defendant.

NATALIA YURIBINA FIGUEROA,

having been duly sworn by the Stenographer, testified as follows:

EXAMINATION

BY MR. CARRILLO:

Q. Ms. Figueroa, thank you very much for appearing here today. As I mentioned before we got on the record, my name is Raul Carrillo. In this case I represent a State of New Mexico employee, a man who worked for the State of New Mexico Children, Youth and Families

**contracted, self-contracted with them.**
Q. Is most of your work in Colorado or is it down in El Paso?
**A. All my work is in Colorado.**
Q. Okay. Very good.
Tell me if you know an individual by the name of Hope Waggoner.
**A. Yes, she's the mother of my grandbaby.**
Q. Okay. How did you meet Hope?
**A. My son.**
Q. Okay. And who is your son?
**A. Jaime Torres.**
Q. All right. And tell me what the direct family relationship with you and Jaime is.
**A. Me and -- I raised him since he was an infant. I was dating his mother, Maria Reyes, for a long period of time. And when we broke up, I still involved myself in his and his sister's life.**
Q. Okay. And what's Jaime's sister's name?
**A. Shaila Torres.**
Q. Shaila. Okay.
So Maria is the birth mother?
**A. Yes.**
Q. And you've been around Jaime since he was an infant, it sounds like.

**A. Yes.**
Q. Okay. Good.
So do you remember when Jaime first introduced you to Hope? What day that might have been or what month?
**A. It was actually that year when all that happened. He introduced me to her when the baby was born.**
Q. Okay. Did you know Hope before the baby was born?
**A. I didn't know her, but I did speak to my son on the phone and she was there, you know. We talked. That's about it.**
Q. Okay. Great.
What did you think about Hope the first time you chatted with her?
**A. Well, I didn't like that she was underage and my son was dating an underage, you know, young girl because that could get him in trouble. He didn't understand that. So I wasn't too happy about it, but then he got her pregnant so that went there so...**
Q. Okay. Do you know the baby, Valeria?
**A. Yes. I met her when she -- well, like I said she was born, they came to my house -- to my mother's house, not my house. They went to my mother's house,**

Children, Youth and Families.

Did you meet with somebody in Texas or somebody in New Mexico?

**A. New Mexico.**

Q. Okay.

**A. And her name was Hannah, I believe.**

Q. Okay. We have a witness in this case named Hannah Duron.

Does that name sound correct?

**A. Yes, that's her CPS caseworker.**

Q. Okay. And so you met with Hannah before the domestic violence incident?

**A. Yes.**

Q. Before the incident that caused you to call the police.

**A. Yes, sir.**

Q. Okay. Great.

(Discussion off the stenographic record.)

Q. (BY MR. CARRILLO) Ms. Figueroa that's my fault. I should have known better and I'm rushing to hear your story 'cause I know you have a time restriction so I'll slow down a little bit.

Okay. You indicated as a part of your answer earlier that you spoke with Ms. Duron.

Did you discuss Hope's relationship with



34055350-cc36-4dd0-8905-0170832de544

Jaime with Ms. Duron?

**A. Yes, sir.**

Q. Okay. Tell me what you said and what she said as best you recall.

**A. Well, it's been a long time so I mean I had told her that my son is putting hands on her. And she even looked at Hope and asked her and Hope just, you know, kind of like put her head down and nodded, you know, not really saying much. And we told her like, "You got to speak up in order to get help. Like we can't help you unless you want to."**

Q. Okay. And what did you mean -- in case the jury doesn't understand, what did you mean by your son was putting hands on her?

**A. That he was hitting her, like smacking her around, beating her up type of stuff.**

Q. Okay. Is that -- were you concerned about Hope's safety? Is that why you wanted to adopt her and take her to Colorado?

**A. Yes, 'cause prior to that, two weeks before I came to El Paso, I got a call at 1:00 in the morning and it was my son. And I answered and I was like -- I was asleep, I was like, "What's going on?" because nobody calls me in the middle of the night. And I overheard him and Hope. He's -- he was just like -- 'cause my**


34055350-cc36-4dd0-8905-0170832de544

kids call me Dad. They don't call me Mom. So my son's like, "Dad, what are you doing?"

And I'm like, "What's wrong? What's going on?"

And he's like, "Well, I'm going to send you the girls."

And I'm like, "What do you mean you're going to send me the girls?"

Like, "I'm just going to send them over there."

And then I just hear Hope on the background saying, "Tell her. Tell her. Why don't you tell her?"

And I'm like, "What's going on, Pollo?" 'Cause that's what we call him. I'm like, "What's going on, Pollo?"

And he's all like, "Well, you hit me."

And I was like -- and she's like, "Well, tell her why I hit you."

And then he was like -- she was like, "Tell her. Tell her what you did."

And then she's just screaming in the back saying that he put a pillow on top of her trying to suffocate her so that's why she hit him.

And I was -- and I told him, "You cannot be putting your hands on this woman. Like that's --


34055350-cc36-4dd0-8905-0170832de544

**especially in front of your baby."**

**And then from there, they hung up on me.**

Q. Okay. So you had that concern by the time you met with Ms. Duron?

**A. Yes, I did.**

Q. Okay. And in Ms. Duron's testimony, we heard a story about your son pushing Hope down a stairway.

Do you know anything about that story -- while she was pregnant?

**A. She told me a lot of stories at my mom's. There -- there were a lot of stories. And I can't recall a lot of stories because this is almost two years ago. My grandbaby is almost two so -- and, yes, she said a lot of things about my son so...**

Q. Okay. All right.

On the day that you made the 911 call, please tell us what caused you to make the call.

Why did you pick up the phone?

**A. Okay. So that day after we came back from CPS and whatever, she made the choice. I told her -- she made the choice to call her mom -- this is her story that she told me.**

**She was going to call her mom and her mom was going to come from New Mexico to come pick her up. And when the time came, she's like "Okay, well, my mom's**

outside pulling up."

I said okay. And we were putting the baby in the car seat and then getting all her bags. Me, my son that's 17 now, we helped her outside with the baby and this van pulled up. So when this van pulled up, I had the baby in the car seat and I was trying to see if they were going to open the door. So I went around and I looked around. And then I had seen my son in there. And I guess he was freaking out because he didn't think I was going to come out and walk her with the baby. So I guess he was freaking out not knowing what to do.

So all -- like a couple of seconds later, he pops out of the van trying to stab me with a knife. And I had the baby in my -- in my hands in the car seat so I'm trying to dodge him and move the baby while he's trying to stab me. And then I finally -- I'm like, "What's wrong with you?"

I put the baby down. And then from there, Hope came around and then my son was just standing there watching everything, my young son. And then he grabbed the baby, just tossed her in there and then after that, grabbed Hope and tossed her in there and then after that got the -- the stroller and tossed it in there behind her and hit her with it. And then -- and she was like, "Stop."

**And he was like, "That's what you get, you stupid bitch."**

**His exact words.**

Q. Okay. In Ray's notes from your conversation last night, there's a reference to the way that Jaime put VT, Valeria, into the car. And his notes suggest -- and I want you to tell me if this is true -- that the car seat with the baby in it was actually thrown into the vehicle. It wasn't placed into the vehicle.

**A. No, it wasn't placed. It was -- she was tossed in there.**

Q. Okay. All right.

Your -- I met your son. And I had a long conversation with him together with his attorney. And he told me about a history of drug use and a history of violence. And I was impressed by how candid he was. He said, "Yeah, I've had some trouble. I have trouble controlling my temper," and he told me about his drug use.

Did you perceive before you called the police that he might have been high or he might have been on something?

**A. I don't -- I don't know if he was or if he wasn't, but that doesn't give him the right to act the way he acts.**

**work."**

**And he's like, "Well, I'm tired. She could take care of her." And I was like, "You know what" -- and then he had thrown -- he had thrown the phone on the floor. And my mom was asleep in the other room. I told him, "You know what, get your shit and get the fuck out my mom's house. 'Cause you're not going to bring this to your grandma's house. I don't care."**

**And I kicked him out of the house.**

Q. Okay. So we hadn't heard that part of the story yet.

You had already had an argument with him since the day before --

**A. Yes.**

Q. -- and told him he needed to shape up as you've just described.

**A. Mm-hmm.**

Q. Okay. All right. That's helpful.

Against that background now, I think I understand better. Were you offering Hope an alternative about how she could live her life because you knew that Jaime was trouble? That your son was difficult?

**A. Yes, I did.**

Q. Okay. All right. And Hope wasn't ready to

take you up on that offer, it sounds like.

**A. Yeah, she wasn't.**

Q. Were you trying to steal her baby?

**A. No.**

Q. So you consider that to be your grandchild.

Can you think of any reason why you would want to steal the baby?

**A. I would never want to steal her baby.**

Q. Okay. All right.

**A. That don't even make sense.**

Q. There's some suggestion in the record that you were trying to take the baby away from Jaime and Hope, but if that's your grandchild, I don't think I even understand what that means.

**A. Yeah, that doesn't make sense. I would never take any kids from any mother period. So that don't make sense. I was trying to bring Hope and the baby, not just the baby.**

Q. Okay. Okay.

Looking back at Mr. Romero's notes from his conversation with you last night, I noticed that there -- you had a conversation with the investigator, Jacob Torres, from New Mexico on February the 20th. Is that correct?

**A. Yes, I did.**



34055350-cc36-4dd0-8905-0170832de544

Q. And you told Jacob everything that you've just told me.

**A. Yes. And I probably told --**

MR. WALDO: Object to the --

**A. -- more because it was just recent and I remembered everything that happened that day. So Torres probably knows more.**

Q. (BY MR. CARRILLO) Okay. So he knows the -- he knew on the 20th the same story that you've told Mr. Waldo and I today.

**A. Yes.**

MR. WALDO: Object to form.

Q. (BY MR. CARRILLO) Okay. Thank you.

And let me see if there's anything else, I think we're just about done.

Give me a moment to check with Mr. Romero.

**A. Mm-hmm.**

MR. CARRILLO: Ms. Figueroa, that's all of my questions.

I need to advise you because you're a witness in this federal case that you have a right to read a transcript of your deposition. So the court reporter who's been working with us today can turn it into a booklet or she can send it to you by email. You can review it to make sure that everything was taken