**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

**HOPE WAGGONER and JAIME TORRES,**
**as individuals and on behalf of V.T., a minor,**

**Plaintiffs,**

**v.** **No. 3:25-cv-00166-RFC**

**JACOB TORRES, in his individual capacity,**

**Defendant.**

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 73)**

Plaintiffs Hope Waggoner ("Hope") and Jaime Torres ("Jaime") (collectively, "Plaintiffs") respond as follows to Defendant Jacob Torres' ("Defendant") Motion for Summary Judgment (Dkt. 73, the "MSJ").

## I. INTRODUCTION

Defendant has misunderstood the assignment. On August 24, 2026, the Court ordered supplemental briefing on two questions: "(1) whether the *complaint* alleges a constitutional violation(s); and (2) whether the violation(s) is clearly established so that Defendant Jacob Torres would have known he was violating the law." Dkt. 70 at 2 (emphasis added). As the Court's order explained, those were "essentially legal question[s]" that could be resolved before trial. *Id.* at 1 (quotation marks omitted). What the Court *did not* do was reopen the expired dispositive-motion deadline or authorize Defendant to initiate an evidentiary Rule 56 proceeding. Yet Defendant has responded with a full-blown 31-page summary judgment motion containing 60

purported undisputed facts, deposition citations, and affidavits. Defendant's pleading is not captioned as supplemental briefing, but as a motion for summary judgment.

And the problems with the MSJ go beyond its form. Instead of analyzing how the qualified immunity doctrine applies to the allegations in the complaint, the MSJ *replaces* Plaintiffs' allegations with Defendant's own contested factual account. For example, the MSJ treats it as historical fact that Hope consented to V.T.'s transport to New Mexico, yet the complaint (and Hope's deposition testimony) says otherwise. In that way, the MSJ largely fails to address the only salient issues before the Court: whether the complaint alleges violations of Plaintiffs' constitutional rights, and whether the contours of those rights were clearly established.

Here, any reasonable social worker in Defendant's position would know his actions were unlawful. It has long been the law in the Fifth and Tenth Circuits that seizures of children from their parents require a court order, parental consent, or exigent circumstances. None of those conditions were met when Defendant decided to place V.T. in his car and drive her to New Mexico. Likewise, no emergency existed later that day, when Defendant decided to take V.T. into New Mexico state custody without judicial authorization. And it is similarly well-established that a social worker commits a distinct Constitutional violation when they procure a judicial order through use of a misleading probable cause affidavit, which is exactly what happened five days after V.T. was brought to New Mexico. Accordingly, the Court should hold that Defendant is not shielded by qualified immunity.

## II. LEGAL STANDARD

To overcome qualified immunity, the plaintiff has the burden to show that he or she (1) "suffered a violation of their rights as a matter of law," and (2) "the right at issue was clearly established at the time of the alleged misconduct." *Banks v. Herbrich*, 90 F.4th 407, 412 (5th Cir. 2024).

The core analysis is the same whether qualified immunity is raised via Rule 12(b)(6), Rule 12(c), or Rule 56. *Saenz v. G4S Secure Sols. (USA), Inc.*, 224 F. Supp. 3d 477, 481 (W.D. Tex. 2016). The only difference is the factual universe the court considers. If qualified immunity is raised in a motion to dismiss, "the defendant's conduct *as alleged in the complaint* … is scrutinized for objective legal reasonableness. On summary judgment, however, the plaintiff can no longer rest on the pleadings, … and the court looks to the evidence before it (in the light most favorable to the plaintiff)." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

## III. ARGUMENT

### A. The Court Should Disregard Defendant's Extrinsic Evidence.

Defendant's extrinsic evidence should be disregarded. The Court ordered supplemental briefing to assist with a pleadings-stage qualified immunity inquiry. And at the pleading stage, "[t]he crucial question is whether *the complaint* pleads facts that, if true, would permit the inference that Defendants are liable under § 1983, and would overcome their qualified immunity defense." *Guerra v. Castillo*, 82 F.4th 278, 285 (5th Cir. 2023) (quotation marks and brackets omitted) (emphasis added).[1]

---

[1] There is no mechanism for summary judgment on qualified immunity after the dispositive motion deadline but before trial. Defendant's remedy is a Rule 50 motion, after Plaintiffs

Nothing in the Court's order can be reasonably interpreted as authorization to file a summary judgment motion. Additionally, four months ago the Court denied Defendant's request to extend the dispositive motion deadline. Defendant never filed a motion to reconsider that ruling. Defendant may not use a request for supplemental legal briefing as a vehicle for an untimely dispositive motion. *Fed'n of State Massage Therapy Boards v. Mendez Master Training Ctr., Inc.*, 393 F. Supp. 3d 557, 580 (S.D. Tex. 2019) (denying an untimely cross-motion for summary judgment embedded in a summary judgment opposition).[2] Accordingly, the Court should decline to consider Defendant's extrinsic evidence and portions of the MSJ that rely on the same.

**B. Defendant's "Undisputed" Facts Are Disputed.**

Even if the Court does entertain extrinsic evidence, Defendant's factual narrative is largely contradicted by the record and cannot be treated as undisputed. The following disputes concern the primary premises on which Defendant seeks judgment:[3]

**1. Hope did not consent to V.T.'s transportation to New Mexico.**

UMFs 20–21 assert that Defendant asked Hope whether he could bring V.T. to

---

have presented their evidence at trial. *See Edwards v. Cass Cnty., Tex.*, 919 F.2d 273, 274 (5th Cir. 1990).

[2] *Melear v. Spears*, 862 F.2d 1177, 1184 (5th Cir. 1989) ("[A] defendant may fail to or choose not to move for summary judgment. In these instances, the policies encouraging pretrial, speedy immunity determinations—in particular, the policy favoring avoidance of the processes of litigation—do not apply, of course. At this point, then, the trier of fact must determine the objective legal reasonableness of an officer's conduct by construing the facts in dispute….").

[3] Due to space and time constraints, Plaintiff will not respond fact by fact to the UMFs. If the Court wants full Rule 56 motion practice, Plaintiff requests additional time to prepare a response to the MSJ. Under local rule 7(D), responses to motions for summary judgment are due 14 days after filing of the motion. Plaintiffs had only seven days to submit their response under the Court's order for supplemental briefing.

New Mexico, and that Hope agreed. UMFs 25 and 30 further assert that Hope never asked Defendant to leave V.T. with Jaime. But Hope's testimony directly contradicts those assertions: she "repeatedly asked" Defendant to leave V.T. with her father, but Defendant said he "wasn't going to allow that," that it "wasn't an option," and that she "had to bring [V.T.] with [her]." *See* Exhibit A ("Hope Dep.") at 47:14–21.[4] When defense counsel later (incorrectly) assumed Hope's consent in his question, Hope corrected him: "I had never given consent to Jacob to transfer my daughter over the state lines." *Id.* 56:16–21; *see also id.* at 57:7–24. Defense counsel even characterized consent during the deposition as "the disputed issue of fact for the trial." *Id.* at 57:15-16.

Defendant's consent story is further undercut by Lorenza Elias. Defendant testified that Elias was present and within earshot during the alleged consent conversation. Exhibit B ("Jacob Dep.") at 65:1–20. But when asked whether she heard that conversation, Elias answered, "No, I didn't hear that." Exhibit C ("Elias Dep.") at 44:4–9.

**2. Defendant—not Hope—loaded V.T. into Defendant's vehicle.**

UMFs 27–28, 36, and 54 rest on Defendant's account that he never took physical control of V.T. and that Hope placed and secured V.T.'s car seat in his vehicle. But Elias testified otherwise. Asked who loaded the baby into the car, she identified the CPS worker, confirmed that she meant Defendant, and affirmed that she was sure. Elias Dep. at 70:17–25. She also recalled Defendant directing Hope to

[4] All exhibits are included with the attached Declaration of Benjamon Gubernick

the other side of the vehicle while he secured V.T. in the back seat. *Id.* 42:7–14. That eyewitness account directly contradicts the physical-control premise on which Defendant's no-seizure argument relies. MSJ at 15–18.

**3. Jaime was available to take V.T.**

Defendant relies on UMFs 29–35 to assert that no other appropriate adult caregiver was available and that he did nothing but "maintain the status quo." MSJ at 18. Yet Jaime testified that Hope gave him Defendant's telephone number, that he called while Defendant was on the way to retrieve Hope, and that he asked whether V.T. could go with him. Jaime Torres Dep. 55:2–11. Defense counsel specifically clarified whether Jaime spoke to Defendant "while he was coming down from Las Cruces," and Jaime answered, "Yes." *Id.* 55:19–21.

For sure, Defendant claims that his first contact with Jaime occurred at 10:59 a.m., after the return to New Mexico. Dkt. 73-4 ¶ 55; MSJ at 24. But that just underscores that a disputed fact exists that will require resolution by the jury.

**4. A SCI report's intake labels do not by themselves constitute a report of child abuse.**

UMF 5 alleges that Defendant saw a New Mexico Statewide Central Intake ("SCI") report that V.T. as a victim of physical neglect by Hope. The SCI report's cover sheet does code V.T. as an "Alleged Victim," Hope as an "Alleged Perpetrator," and the allegation as "Physical Neglect / Other Neglect." Dkt. 73-3 at 1. But the report's source narrative contradicts those classifications. The report describes a request for assistance because officers could no longer keep the children at the station, describes an alleged knife-related altercation, and expressly states: "It is unknown if Hope

Lynn and [V.T] were exposed to the incident." *Id.* at 3. The source also reported that no arrests had been made and the investigation was ongoing. *Id.*

Hannah Duron confirmed that a SCI worker completed the form and that SCI personnel assign its response priority. Exhibit E ("Duron Dep.") at 71:6–18, 72:8–13. Defendant may not transmute intake classifications into a report of child abuse by the Socorro Police Department, especially when the narrative expressly left the children's exposure unknown. Moreover, Defendant acknowledged that his own visual inspection at the station revealed no visible bruising or marks on V.T. Jacob Torres Dep. 97:1–8.

**5. The morning transport and evening custody decision must be evaluated on their respective factual records.**

By Defendant's own chronology, the interviews supplying the allegations invoked to justify the evening removal occurred after Defendant returned to New Mexico: Duron at 9:58 a.m., Figueroa at 10:08 a.m., and the conversation with Jaime that Defendant places at 10:59 a.m. UMFs 42–49. Those later-acquired details cannot be treated as information he already possessed when he transported V.T. from Texas. As for the evening decision, Defendant's own account places these interviews hours before the court's stated 4:00 p.m. closing time, yet identifies the formal custody transfer as occurring at 7:07 p.m. UMFs 53, 56; MSJ at 24. That chronology does not establish that earlier judicial authorization was unavailable.

**C. Defendant Is Not Entitled To Qualified Immunity.**

Although the qualified immunity analysis places the burden of proof on Plaintiffs, the Court is required at this juncture to credit Plaintiffs' account of events.

Thus, the factual universe is one where Defendant: (1) Decided to override both parents' wishes and transport V.T. across state lines without consent or judicial authorization; (2) Participated in taking "emergency" custody of V.T. in Las Cruces when no threat of imminent harm existed; and (3) Omitted information from his probable cause affidavit that showed V.T. had no connection to New Mexico.

Each event is a discrete Constitutional violation, and must be evaluated separately, on the information available when each occurred—not on Defendant's preferred version of the disputed facts. *Tolan v. Cotton*, 572 U.S. 650, 655–57 (2014).

**1. Constitutional Violations.**

**a. The compelled transportation of V.T. from Texas violated V.T.'s Fourth Amendment rights.**

The governing rule is straightforward: a social worker "may not seize a child from his or her parents absent a court order, parental consent, or exigent circumstances." *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 429 (5th Cir. 2008). Applied here, none of those exceptions were present.

To start with, there was no consent. Defendant refused Hope's repeated requests to leave V.T. with Jaime, told her that bringing V.T. was mandatory, personally loaded V.T. into his vehicle, and drove her to another state. Hope Dep. 47:14–21; Elias Dep. 70:17–25. Jaime separately testified that he requested his child during a call before Defendant arrived in Texas and was refused. Jaime Torres Dep. 55:2–11, 19–21. Accordingly, Defendant used governmental authority to determine where the infant would go, contrary to the parents' wishes. *See Jones v. Hunt*, 410

F.3d 1221, 1225–28 (10th Cir. 2005) (recognizing a seizure where a CYFD worker and deputy used threats to compel a minor to leave her mother's custody for her father's).

Defendant argues that no seizure occurred because Hope accompanied V.T. But that confuses physical proximity with freedom from governmental restraint. A seizure occurs when an official intentionally restrains a person's movement through physical force or a show of authority; it does not require isolation from every other person. *See, e.g.*, *Brendlin v. California*, 551 U.S. 249, 254–57 (2007) (governmental control over a vehicle can seize its passenger as well as its driver).

Nor did CYFD's custody of Hope supply authority over V.T. Defendant and his supervisor recognized that only Hope was in custody and that consent was required to bring V.T. Jacob Dep. 59:1–8; Dkt. 73-4 ¶ 15. Hope's testimony establishes not merely silence, but an express objection and Defendant's assertion that she had no choice. Hope Dep. 47:14–21, 56:16–21, 57:7–24. Acquiescence to a show of authority is not voluntary consent. *Bumper v. North Carolina*, 391 U.S. 543, 548–50 (1968).

There was also no court order authorizing the Texas seizure. Any later invocation of New Mexico's temporary emergency jurisdiction does not change that chronology. The Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), which Texas and New Mexico have adopted, conditions jurisdiction on the child's presence in New Mexico; it does not authorize an official to compel a child's interstate transportation so that the condition becomes satisfied. NMSA 1978, § 40-10A-204. Although the UCCJEA's jurisdictional rules are not the federal constitutional test, the pertinent point is narrower: neither CYFD's existing custody

of Hope nor a court's later authority over a child present in New Mexico supplies the consent, order, or exigency missing when Defendant seized V.T.

Finally, the information available before the transport did not establish an emergency requiring a seizure. The SCI narrative described an alleged knife-related altercation between Jamie and a third party the previous night, but expressly stated that it was unknown whether Hope or V.T. had even been exposed to the altercation. Dkt. 73-3 at 3. Its intake codes do not themselves establish imminent danger. Defendant's contemporaneous observation, recorded in his custody affidavit, was that V.T. was "clean and healthy with no visible marks or bruising." Dkt. 73-12 at 2 (Aff. ¶ 2(iii)); Jacob Torres Dep. 97:1–8. Moreover, when Defendant arrived, V.T. was in an office at a police station, not alone on a street or trapped in a hot car. Tellingly, the SCI report states that Texas Child Protective Service had arrived, evaluated the situation, and then left, further dispelling the notion that any emergency existed.

Under Defendant's version of events, "[a]t the time Jacob met with Hope at SPD, Jacob had no knowledge, other than what was contained in the SCI Report, regarding the circumstances of why Hope had VT with her at SPD[.]" UMF 22. Even if Defendant later learned information that could support exigency (which he did not), such information cannot retroactively save an illegal seizure. *See Gates*, 537 F.3d at 429–30 (evaluating the information known when the removal decision was made).

Finally, Defendant's supposed choice between taking V.T. and leaving her unattended is a red herring. Both parents proposed that V.T. remain with Jaime; neither proposed abandonment. Defendant also could have sought assistance from

the Texas authorities already involved. Defendant's contention that it would have been "unsafe" to leave V.T. with the police is pure *ipse dixit*. Additionally, there was no exigency requiring Defendant to bring Hope back to New Mexico *at that moment*. Indeed, Defendant's instructions were to *not* take V.T. to New Mexico *unless* Hope consented. The pertinent question is whether the circumstances required Defendant to take V.T. to New Mexico without consent or an order. Available alternatives are part of that inquiry. *Wernecke v. Garcia*, 591 F.3d 386, 397–99 (5th Cir. 2009).

**b. The evening custody decision also violated the Fourth Amendment.**

For similar reasons, Defendant committed a second constitutional violation when he caused V.T. to be taken into formal state custody at 7:07 PM. No judicial order authorized that action, there was no consent, and no exigent circumstances existed to support the seizure. The MSJ's counterarguments lack merit.

First Defendant contends that exigency justified taking V.T. into CYFD custody at 7:07 p.m. MSJ at 23–26. But exigency requires the child to be "in *immediate* threat of death or severe physical harm." *Lowther v. Child. Youth & Fam. Dep't*, 101 F.4th 742, 761 (10th Cir. 2024) (emphasis original).[5] *See also Gates*, 537 F.3d at 429 ("Exigent circumstances in this context means that, based on the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse if he remains in his home.").

[5] As this violation occurred in New Mexico, Plaintiff will cite Fifth Circuit and Tenth Circuit cases. Case law from those Circuits appears to be in accord in all relevant respects.

The contemporaneous record does not show CYFD reacting to a new physical danger, or an imminent threat of any kind. On the contrary, lapel camera video of Defendant's interactions with the Las Cruces Police Department shows Defendant implementing an already-arranged removal. As opposed to an imminent threat, CYFD's fear is jurisdictional—it believes Hope might later go back to Texas, which would cause CYFD to "lose the baby." (7:09:30 p.m.). Indeed, Defendant states that CYFD is not acting based on any specific danger, but rather because CYFD "know[s] [Hope's] patterns, and [has] major concerns, especially with dad." (7:16 p.m.).[6]

As a matter of law, nebulous "concerns" based on conjecture and "patterns" are not exigent circumstances. As *Gates* explains:

> [B]efore a social worker can remove a child from a public school … without a court order, the social worker must have a reasonable belief that the child has been abused and probably will suffer further abuse upon his return home at the end of the school day. This reasonable belief *must be based on first-hand observations of [child protective services] employees*[.]

537 F.3d at 433 (emphasis added). Texas CPS evaluated the situation the night before and did not take V.T. into custody. To the extent Defendant believed that his investigation uncovered information which called that determination into question, his remedy was to call Texas CPS, not to prevent V.T. from returning to her home state. That is especially true because, as already discussed, evidence that Jaime or Hope had *ever* abused V.T. was essentially nonexistent.

[6] The full video will be lodged with the Court. To the extent the Court does opt to consider extrinsic evidence while resolving the qualified immunity issue, Plaintiff encourages the Court to watch the whole thing.

Nor does Defendant's "the courts were closed" excuse provide a safe harbor. According to Defendant's own chronology, he conducted the relevant interviews at 9:58, 10:08, and 10:59 a.m., while the court remained open until 4:00 p.m. UMFs 44, 49, 56; Dkt. 73-4 ¶ 55. *Banks* specifically treats an agency's earlier possession of the relevant information as a reason it could have sought an order rather than relying on the courts' later unavailability. 90 F.4th at 413–15 (5th Cir. 2024). In other words, Defendant may not sit on information until the court closes and then argue that the court being closed provides exigent circumstances.

Exigency depends on reasonable cause to believe a child faces imminent physical or sexual abuse. *Gates*, 537 F.3d at 429. Court closure and flight risk are by themselves insufficient. *Wernecke v. Garcia*, 591 F.3d 386, 399 (5th Cir. 2009) ("Although several factors seem to weigh towards the reasonableness of the removal—(1) business hours were concluded and obtaining a court order would likely not be possible in a timely fashion, (2) the risk of flight was high, the sum of the … facts does not indicate the existence of truly exigent circumstances."). Viewed in the light most favorable to Plaintiffs, the only other circumstances that Defendant considered were a desire to investigate the overall suitability of V.T.'s Texas home and vague "concerns" about Jaime. Those are not the sorts of particularized, articulable risks that could support dispensing with judicial authorization.

Finally, Defendant may not evade liability by claiming he was a mere bystander. Defendant's own probable cause affidavit states that he conducted the investigation, presented the facts in the staffing discussions that produced the

custody decision, and willingly prepared the affidavit used to obtain continued custody. Jacob Dep. 119:6–120:18; Dkt. 73-4 ¶¶ 58–65. And most importantly, the MSJ's characterization of Defendant's involvement is crossways with the lapel camera video of V.T.'s separation from Hope. That footage shows Defendant handing the emergency custody form to the Las Cruces Police Department officer and telling him which boxes to check. The footage further records Defendant saying "we are gonna take custody of the baby" and laying out CYFD's rational to the police officer.

"[T]o state a cause of action under section 1983, the plaintiff must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violations alleged." *DeMarco v. Davis*, 914 F.3d 383, 390 (5th Cir. 2019). The lapel camera video and probable cause affidavit demonstrate personal involvement by Defendant. Insofar as the MSJ seeks to minimize Defendant's role, those efforts fail.

**c. Defendant's affidavit misrepresented facts in violation of the Fourth Amendment.**

Defendant committed an additional constitutional violation when he submitted his probable cause affidavit on February 25. That is because "procurement through distortion, misrepresentation and omission of a court order to seize a child is a violation of the Fourth Amendment." *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1316 (10th Cir. 1999) (citation and quotation marks omitted).

Defendant's probable cause affidavit omits and misrepresents the facts which would later cause the state court to dismiss the case for lack of jurisdiction. Most

importantly, Defendant stated he was unaware of ties V.T. had to New Mexico. Indeed, he testified he had no information she lived there, had ever been there, or had any New Mexico connection before he personally transported her there. Jacob dep. at 43:9-20. Yet his affidavit emphasized Hope's lengthy New Mexico custody while omitting V.T.'s lack of New Mexico connections and states only that her paternal family was "in another state and could not be assessed." It also omits evidence that both parents wanted V.T. to remain in Texas with Jaime, and that V.T. had resided in Texas prior to Defendant driving her to New Mexico. Additionally, "[t]he fact that the order was allegedly obtained by omissions, rather than affirmative misstatements, is irrelevant, so long as the omissions are so probative they would vitiate probable cause." *Malik*, 191 F.3d at 1316.

Viewed in the light most favorable to Plaintiffs, these omissions were not accidental, but rather intended to mask a known jurisdictional defect. *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019) ("It is also clearly established that a constitutional violation occurs if an official makes a knowing, intentional, or reckless false statement or omission that causes the issuance of a warrant without probable cause that leads to the removal of a child from its parent's custody.").

**d. The same conduct infringed the parents' due-process rights.**

V.T.'s Fourth Amendment claim and her parents' procedural due-process claims protect different interests but turn on the same legal theories. *Romero v. Brown*, 937 F.3d 514, 523 (5th Cir. 2019) ("in child removal cases we have repeatedly allowed parents to vindicate their due process right to direct the upbringing of their

children even when the same conduct supports a child's Fourth Amendment claim."). Defendant acknowledges that the claims rise or fall together. MSJ at 19.

**2. Clearly Established Law.**

The second part of the qualified immunity analysis asks whether the allegedly violated rights were clearly established. Here, that standard is met.

**a. The transport of V.T. from Texas to New Mexico.**

**i. Fourth Amendment and procedural due process.**

Starting with Plaintiffs' Fourth Amendment and procedural due process claims, before February 20, 2025, the Fifth Circuit had repeatedly held that nonconsensual child removal requires judicial authorization or a genuine emergency. *Gates*, 537 F.3d at 429–30, 438; *Wernecke*, 591 F.3d at 399–401; *Romero*, 937 F.3d at 521–23. In January 2024, *Banks* reaffirmed that this rule was clearly established and rejected the contention that a plaintiff must identify a prior child-removal case presenting the same asserted dangers. 90 F.4th at 415–16.

Defendant argues that not seizing V.T. would have placed her "at grave risk." MSJ at 18. But that is just a repackaged version of Defendant's exigent circumstances argument. It presents a false dichotomy, overlooks that Defendant knew he was not legally permitted to take V.T. without Hope's consent, and assumes that V.T. was somehow in danger at the police department and in need of rescue by Defendant.

Also, it bears emphasis: Defendant was not torn between conflicting legal obligations. He was dispatched by his employer to a state outside his jurisdiction to taxi Hope back to Las Cruces. At most, V.T.'s presence created a logistical problem

that had to be solved before he could complete his assigned work task. "My boss told me to do it" is not a recognized defense in a Section 1983 case.[7] Nor is a belief that a state law duty somehow obligates a public official to violate the Constitution. *Gates*, 537 F.3d at 421 ("A statutory command to investigate allegations within twenty-four hours is not a license to ignore the Fourth Amendment, and it is unreasonable for the defendants to think otherwise.").

Defendant's contention that his seizure of V.T. "was not a seizure at all" because she "remained in the physical custody and care of her mother" is similarly unavailing. The Fourth Amendment does not ask whether V.T. remained physically beside her mother. Rather, it asks whether government action restrained V.T.'s movement and exercised control over her disposition. Crediting Plaintiffs' evidence, Defendant rejected both parents' requests that V.T. remain in Texas, physically placed V.T. in his vehicle, and transported her to another state. The fact that Hope—herself compelled to return to New Mexico—rode in the same vehicle does not transform that governmental restraint into a consensual trip, particularly as to V.T. Defendant cannot avoid a seizure merely by taking the parent and child together.

In *Hope v. Pelzer*, the Supreme Court cautioned courts against "overreliance on factual similarity" and to instead ask whether factual differences between cases create a "constitutional distinction[.]" 536 U.S. 730, 742 (2002). And in *Banks*, the Fifth Circuit held that it was "clearly established that [Plaintiffs] had the right not to have their child-parent relationship invaded by government actors without court

---

[7] And as already discussed, Jacob admits his boss told him *not* to take V.T. without Hope's consent.

order, consent, or exigent circumstances." 90 F.4th at 415. That is a clear rule and applies here with obvious clarity. Qualified immunity on the Fourth Amendment and procedural due process claims should be denied.

**ii. Substantive due process.**

*Romero* recognized that "in a substantive due process analysis, the right to family integrity must be balanced against the state's interests in protecting the health, safety, and welfare of children." 937 F.3d at 520. And that "[a] balancing test is difficult terrain for a party having to prove a clear violation of the law." *Id.* However, as it pertains to the transport of V.T. from Texas to New Mexico, this is the rare case where qualified immunity is inappropriate.[8] That is because there is nothing to balance: New Mexico has no legitimate interest in exercising state power in Texas. As already discussed, to Defendant's knowledge, V.T. had no ties whatsoever to New Mexico. Moreover, Defendant knew CYFD had custody only of Hope and that V.T. could be brought to New Mexico only with parental consent.

On Plaintiffs' facts, there was accordingly little, if anything, on the governmental side of *Romero*'s balancing test. A State cannot manufacture the governmental interest necessary to justify interference with family integrity by first exercising authority it does not possess.

**b. V.T.'s separation from Hope in Las Cruces.**

Ample Tenth Circuit authority put Defendant on notice that the 7:07 p.m. separation from Hope violated V.T.'s Fourth Amendment rights and Hope and

---

[8] Plaintiffs concede that, for the evening separation from Hope and the misleading search warrant, the law is insufficiently clear to support substantive due process claims.

Jamie's Fourteenth Amendment procedural due process rights.

In *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1242 (10th Cir. 2003), the court expressly held that "the state's interest in protecting children does not excuse social workers from the warrant requirement of the Fourth Amendment." *See also id*. at 1242 ("Simply put, unless the child is in imminent danger, there is no reason that it is impracticable to obtain a warrant before social workers remove a child from the home."). That decision is "consistent with the concept that, by definition, circumstances qualify as 'exigent' only if there is a need for immediate action." *Lowther v. Child. Youth & Fam. Dep't*, 101 F.4th 742, 765 (10th Cir. 2024).

In assessing whether there is a risk of imminent harm, important factors social workers should consider include:

> [T]he strength of the evidence indicating prior abuse, the severity of the prior abuse, the temporal proximity to the prior abuse, the identity of the alleged abuser, the alleged abuser's access to the child, and whether there is time to obtain a warrant or judicial authorization.

*Id*. at 766. Under that standard, no reasonable social worker would believe V.T. was at imminent risk of harm. The evidence of past abuse (to the extent there was any) was second or third hand, uncorroborated, and vague. Additionally, Defendant stated he had "concerns" about Jaime, but Jaime was not even in the same state. Lastly, Defendant completed his phone call interviews before noon, hours before the court closed. Again, the lapel camera video speaks for itself—there was simply no basis to believe exigent circumstances existed.

**c. The probable cause affidavit.**

Finally, the affidavit theory invokes a specifically established rule, not an

abstract right to family integrity. By 2019, *Marks* expressly recognized both the child's Fourth Amendment protection and the parent's corresponding Fourteenth Amendment claim when knowing or reckless material deception produces a child-seizure order without probable cause. 933 F.3d at 486–87. Likewise, *Winfrey v. Rogers* 901 F.3d 483 (5th Cir. 2018) had also made clear that a tainted intermediary decision does not insulate the official responsible for the taint. *Id.* at 496–97. And *Malik* applied the prohibition on materially misleading custody applications in the Tenth Circuit. 191 F.3d at 1315–16 ("An ex parte hearing based on misrepresentation and omission does not constitute notice and an opportunity to be heard."). Those decisions supplied notice before February 2025; whether corrections would eliminate probable cause is a separate materiality inquiry, not an absence of clearly established law.

### D. The Court Should Not Consider Defendant's Remaining Arguments

The arguments on pages 23-29 of the MSJ are not about qualified immunity. Rather, they ask the Court to determine that damages terminate at 7:07 p.m., that a later state-court order broke the causal chain under the independent-intermediary doctrine, and, alternatively, that damages terminate upon entry of the ex parte state court order. Those are causation and damages issues, not questions concerning whether Defendant violated clearly established law. Because the Court did not invite a new dispositive motion on causation or damages, those requests should be denied without prejudice to whatever properly presented issues remain for trial.

## IV. CONCLUSION

For the foregoing reasons the Court should deny qualified immunity

Date: September 15, 2026

Respectfully submitted,

**WGLA, LLP**

By:*/s/ Curtis Waldo*
Curtis Waldo
curtis@wglawllp.com
Benjamin Gubernick
ben@wglawllp.com
Telephone: 346-394-8056
Fax: 346-341-0169
717 Texas St. Suite 1200
Houston, TX 77002

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2026, I caused the foregoing document to be served on counsel of record and filed with the Court.

*/s/ Curtis Waldo*
Curtis Waldo