**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

**HOPE WAGGONER and JAIME TORRES,**
**as individuals and on behalf of V.T., a minor,**

**Plaintiffs,**

**v.** **no. 3:25-cv-00166**

**JACOB TORRES,**

**Defendants.**

**AFFIDAVIT OF JACOB TORRES**

**STATE OF NEW MEXICO** §
§
**COUNTY OF DOÑA ANA** §

I, Jacob Torres, swear or affirm under penalty of perjury under the laws of the State of New Mexico that the following statements are true and correct:

1. My name is Jacob Torres.
2. I am over eighteen (18) years of age, and give this statement freely, and of my own accord.
3. I am employed by the New Mexico Children, Youth and Families Department ("CYFD") a Child Abuse and Neglect Investigator.
4. I have been employed by CYFD since March 2023, and as an Investigator since approximately September or October of 2023.
5. I was employed as an Investigator on February 20, 2025.
6. As an Investigator I am tasked with investigating allegations of child abuse and/or neglect.
7. I have personal knowledge of certain facts related to the above captioned case, which I learned and observed as a direct result in my involvement in the case.
8. I was working, and on duty on February 20, 2025.

EXHIBIT
3

9. On February 20, 2025, I was the on-call Investigator for the Dona Anna County office of CYFD ("DAC").

10. As the on-call Investigator, I was required to handle calls regarding investigation of alleged child abuse and/or neglect that came into CYFD outside of normal CYFD business hours.

11. At approximately 5:00 a.m., on February 20, 2025, I received a call from my supervisor, Claudia Cavazos ("Cavazos"), regarding a report received by DAC from CYFD Statewide Central Intake ("SCI") that Hope Waggoner ("Hope"), who was in CYFD custody, had been picked up by the Socorro Police Department ("SPD"), and was being detained in Socorro, Texas.

12. I was told by Cavazos that I needed to travel to SPD to pick-up Hope.

13. After the call I traveled to DAC, and retrieved a copy of the SCI Report, read it, and prepared to travel to SPD. A true and correct copy of the SCI Report is attached to Defendant's Rule 56 Motion for Summary Judgment on Qualified Immunity, and Partial Summary Judgment on Plaintiff's Damages Claims ("Motion") as Exhibit 2.

14. Upon reading the SCI Report, I learned that Hope had her three-month-old infant child, VT, with her at SPD, that the two of them had been at SPD for approximately six (6) hours, and that there was no current custody order in place regarding VT.

15. Prior to arriving at SPD, I spoke with Cavazos regarding the fact that only Hope was in the legal custody of CYFD, and that I needed to obtain Hope's consent to bring VT back with Hope to New Mexico.

16. Upon my arrival at SPD, at approximately 8:14 a.m., on February 20, 2025, I made contact with Lorenza Elias ("Elias"), a Victims Advocate employed by SPD.

17. Elias escorted me into an interior office at SPD where I met with Hope, and her infant child VT.

18. Hope was in the interior office with VT in Hope's physical custody.

19. At the time I met with Hope, I had no knowledge regarding the circumstances of why Hope had VT with her at SPD, I just knew that she did.

20. Prior to my arrival at SPD, I had not spoken with anyone, nor did I speak with anyone while I was at SPD, including Elias, about the reasons why Hope had VT with her at SPD.

21. At no time during my contact with Hope, did Hope tell me about any of her interactions with SPD Officers, or what the any SPD Officer or employee had said to her.

22. At no time during my interactions with Hope at SPD, or on the trip back to New Mexico, did Hope ever mention Jaime's name or talk to me about Jaime, except to tell me that there had been an altercation between Jaime and Jaime's step-mom.

23. I learned from Elias that Texas CPS had arrived at the SPD before I had arrived, but left SPD after the SCI Report was made with New Mexico.

24. I told Hope I was there to transport her back to New Mexico, and asked Hope whether she wanted to bring VT with her back to New Mexico.

25. Hope told me "yes, she would not be leaving without her baby."

26. While in the interior office at SPD, I talked to Hope about the incident that occurred that led to her being detained by SPD. Hope told me there was a verbal altercation between Jamie Torres ("Jaime") and his parents, and that it was "stupid."

27. I did not speak with VT, because VT was a three-month-old infant.

28. After the brief interaction with Hope, I exited the SPD building by myself and contacted Cavazos. I told Cavazos that Hope consented to bringing VT back to New Mexico, and we would be heading back to DAC.
29. A few minutes later, Elias, Hope and VT exited SPD.
30. Hope was carrying VT in a car seat, and Elias was carrying Hope's belongings.
31. I opened the trunk of my vehicle, and assisted Elias with placing Hope's belongings in the trunk.
32. Hope maintained physical custody of VT, placed VT's car seat in the backseat of my vehicle, and strapped her in.
33. At no time did I touch or otherwise take physical control of VT prior to the time Hope strapped VT into the backseat of my vehicle.
34. At no time while I was at SPD, did I have contact with any persons other than Elias, Hope, and VT.
35. At no time while I was at SPD did I have any contact with any other appropriate adult who was available to take physical custody of VT prior to our departure back to New Mexico.
36. It would have been unsafe, and inappropriate for me to transport Hope back to New Mexico, and leave VT unattended at SPD.
37. On the way back to New Mexico, I made one stop, at Hope's request, to allow Hope to use the restroom.
38. While Hope was in the restroom, VT remained in her car seat in the back of my vehicle. At no time while Hope was in the restroom did I touch or take physical control of VT.
39. When Hope returned from the restroom, Hope re-entered the backseat of my vehicle and we continued our trip back to New Mexico.

40. During the trip back to New Mexico, Hope told me that she would run away and go back to Texas the first chance she got.

41. Upon our arrival at DAC, I exited my vehicle, Hope retrieved VT, and her belongings, and we entered the office.

42. Upon entry into DAC, I arranged for Hope to go with Hannah Duron ("Duron"), Hope's CYFD Permanency Worker, as Duron was going to have to find a placement for Hope.

43. At the time I left Hope with Duron, Hope had VT in her physical custody and control.

44. At no time during my interaction with Hope and VT, from the time I first encountered Hope and VT at SPD, and until Hope and VT went with Duron at DAC, did I ever touch or exercise any physical control over VT.

45. At no time during my interaction with Hope and VT, from the time I first encountered Hope and VT at SPD, and until Hope and VT went with Duron at DAC, did I ever separate Hope and VT, or prevent Hope from providing care to or for VT.

46. Once Hope went with Duron, I began investigating the allegations made in the SCI Report.

47. I have a statutory duty under New Mexico law (NMSA 1978 § 32A-4-3 (C)) to investigate a report that a child has been abused or neglected, and to take immediate steps to protect the health or welfare of an alleged abused or neglected child.

48. My statutory duty applied to VT because the report had been made in New Mexico, and VT was physically present in New Mexico.

49. At 9:58 a.m., on February 20, 2025, I spoke with Duron about Hope. Duron told me that she has not been able to work with Hope much because Hope is always on the run. Duron told me Hope is constantly leaving New Mexico to stay with Jaime in El Paso, Texas.

50. Duron told me she has heard from Hope that there are incidents of domestic violence between Hope and Jaime, and that she (Duron) had concerns about Jaime being around Hope and VT due to the domestic violence, as well as about VT being with Hope when Hope flees from CYFD's custody.

51. At 10:08 a.m. on February 20, 2025, I spoke with Natalia Figueroa ("Figueroa") by phone.

52. Figueroa told me she was Jaime's step-mother.

53. Figueroa told me that on the early morning hours of February 20, 2025, she was helping Hope to a van when Jaime came up to them and started a verbal argument with Figueroa. Jaime then pulled a knife, physically threatened Figueroa with it, and then grabbed VT from Figueroa and physically tossed VT into the van. Jaime then grabbed Hope and forced Hope in to the van. Jaime then got VT's stroller and forced it into the van causing it to hit Hope. Jaime then got into the van himself, and they all left.

54. Figueroa told me she has had conversations with Hope about domestic violence where Jaime does physically assault Hope, and that Jaime has assaulted Hope while she was pregnant. Figueroa also told me she has concerns about Jaime being around Hope and VT because Jaime is mentally unstable, has been in and out of psychiatric hospitals, and has a criminal history.

55. At 10:59 a.m., on February 20, 2025, I was contacted by Jaime Torres. This was my first contact with Jaime.

56. Jaime wanted to know what was going on. I asked Jaime about the incident that had occurred with Figueroa, and Jaime told me he had gone to the home to pick up Hope and VT. Jaime denied there had been any domestic violence, or that there was a weapon

involved. I attempted to question Jaime to get more details about what had occurred, and he refused to give me any further information.

57. During our conversation, Jaime never asked me about Hope or VT, and never requested that VT be released to him.

58. After I had finished speaking with Figueroa and Duron, I attended staffing meetings with my superiors at DAC to discuss what I had learned during my investigation.

59. At the conclusion of the staffing meetings, the decision was made by others at CYFD to seek custody of VT.

60. At the time the decision was made to take custody of VT, I had credible first-hand information from Figueroa that Jaime approached Figueroa and began arguing with her, that during the argument had pulled a knife on Figueroa, and assaulted her while Figueroa was holding VT in a car seat, that Jaime had grabbed the car seat from Figueroa and threw it into the van with VT in it, that Jaime had physically forced Hope into the van, and hit Hope with a stroller which Jaime had also thrown into the van. I had credible information that Jaime had assaulted Hope in the past, including while Hope was pregnant, and that Jaime was mentally unstable, had been in and out of psychiatric hospitals, and that he had a criminal history. Finally, I had information that Hope had a history of constantly running from her CYFD placements to go to El Paso, Texas to be with Jaime, and that Hope told me that she would again be running as soon as she could to go back to El Paso.

61. The Las Cruces Police Department ("LCPD") was contacted, and LCPD Officer Loya arrived at DAC.

62. At 7:07 p.m., on February 20, 2025, Officer Loya signed a CYFD Protective Services Division Statement of Reasonable Grounds for Temporary Protective Services Division

Custody ("statement") placing VT in the custody CYFD's Protective Services Division. A true and correct copy of the statement is attached to Defendant's Rule 56 Motion for Summary Judgment on Qualified Immunity, and Partial Summary Judgment on Plaintiff's Damages Claims as Exhibit 9.

63. At no time after I had arranged for Hope to go with Duron, did I ever touch VT, separate VT from Hope, or restrain or restrict Hope from providing care to or for VT.

64. I recorded the content of my discussions with Hope, Duron and Figueroa in an affidavit which I signed verifying the statements from Hope, Duron and Figueroa were true and correct.

65. CYFD used the affidavit as an exhibit to its Motion for *Ex Parte* Temporary Custody.

66. During my investigation I contemporaneously made notes about what I had learned. The notes are attached to the Motion as Exhibit 6. Paragraph 2 of my notes, lists a time of 8:26 p.m., the time was actually 8:26 a.m. Paragraph 4 of my notes, lists a time of 10:08 p.m., the time was actually 10:08 a.m. Paragraph 5 of my notes lists a date of February 21, 2025, the date was actually February 20, 2025.

JACOB TORRES

STATE OF NEW MEXICO )
) ss.
COUNTY OF DONA ANA )

The foregoing affidavit was signed and sworn to or affirmed before me on this 4 day of September 2026, by Jacob Torres.

Notarial Officer

My Commission Expires 07/27/2030 [Seal]

State of New Mexico
Notary Public
Caren Denise Davila Varela
Commission # 2010101
Commission Expires: 07/27/2030