IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

----------------------------------x

HOPE WAGGONER AND JAMIE TORRES, :
AS INDIVIDUALS AND ON BEHALF OF :
V.T., A MINOR, :
PLAINTIFFS, : Case No.:
v. : 3:25-cv-
THE NEW MEXICO CHILDREN, YOUTH : 00166-DCG
& FAMILIES DEPARTMENT AND JACOB :
TORRES, IN HIS INDIVIDUAL :
CAPACITY, :
DEFENDANTS. :

----------------------------------x

DEPOSITION OF JACOB TORRES
Conducted virtually
Friday, April 3, 2026
12:05 p.m.

Job No.: 628191
Pages: 1 - 125
Recorded By: Durrell Dawson

EXHIBIT
4

Deposition of JACOB TORRES, conducted virtually.

Pursuant to notice, before Durrell Dawson, Notary Public in and for the State of Colorado.

P R O C E E D I N G S

THE REPORTER: I am a notary authorized to administer oaths, and this deposition will be recorded by electronic means. All parties understand and agree that any certified transcript produced from the recording of this proceeding is intended for all uses permitted under applicable procedural and evidentiary rules and laws, and shall constitute written stipulation.

The parties stipulate to the use and certification of this testimony consistent with applicable law of such. Hearing no objection, I will now swear the witness. Mr. Torres, please raise your right hand.

Whereupon,

JACOB TORRES,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. GUBERNICK:

Q All right, sir. Nice to -- nice to meet you. So your attorney just said you've never been deposed before; is that right?

A That's true.

for an investigator.

Q When did you switch over to being an investigator?

A September, October of 2023.

Q Okay. So is that a promotion or demotion, a lateral move? What is that?

A I would say it's more of a lateral move, like transferring to one section of CYFD to another.

Q Why did you transfer to investigations?

A Again, I wanted to work with children's and families, trying to see what I can do to help families that I come in contact with.

Q So you didn't feel like you were doing that in your previous position?

MR. CARRILLO: Objection to the form of the question. Argumentative. You can answer my question.

BY MR. GUBERNICK:

Q You can answer my question.

A Not as strongly as I would have as an investigator.

Q What's the difference?

A So placement worker, you're just working mostly with the foster family that you license, or

A C-L-A-U-D-I-A C-A-B-A-Z-O-S, I believe.
Q Okay. That's good enough. Just trying to preempt. Usually the reporter will have questions later about how to spell something, so try to get out in front. Well, (indiscernible).
MR. CARRILLO: I think you got it exactly right.
BY MR. GUBERNICK:
Q Yeah. You likely be much more likely to know. I don't speak Spanish. Raul speaks Spanish. Okay. The -- so she called. Where were you when -- when she called you?
A At home.
Q Okay. So, were you about to start your shift, or were you -- had your shift already started or what's up with that?
A No, I was on call. So I was taking calls outside of office hours.
Q So, is there always one investigator on call or at least one?
A There's always at least one.
Q Okay. So you were one of the on-call investigators?
A Yes.
Q Okay. So you received this call. Do you

remember around what time you received this call?
A More or less, maybe 5:00 a.m.
Q Okay. Were you asleep?
A Yes.
Q Okay. The call woke you up?
A Yes.
Q All right. So what were you told on that call?
A That there's a child in El Paso that's under our custody, that we need to go pick her up, and that she would send the report.
Q Okay. So that was Hope Waggoner, I'm assuming?
A Yes.
Q Okay. So, did you -- did she send the report?
A She did.
Q How did you receive this report?
A Through email.
Q Okay. All right. Did you read the report?
A I did.
Q Was that the sky report?
A Yes.
Q Okay. Okay. Did you talk to anybody else before you went down to El Paso?

A I talked to Cynthia Galvan. She was the placement and permanency supervisor on call at the time.

Q All right. Well, what is -- what is that job? Tell me about that job? What does that mean?

A So we have our permanency department. The one -- they're the ones that take care of the cases after investigations for the children and families. Placement, like I have said before, was the licensing department, CYFD. So she was the on-call supervisor for anything that happened between those two departments.

Q Okay. Where did that call happen?

A I was already at the CYFD office when I got that call.

Q All right. So let's just try to walk through your -- your regular morning. So you get this call around 5:00 a.m. The report was emailed to you. Did you look at the report at your house, or did you look at it when you got to the office?

A I first looked at it at home on my phone, and then I printed it out at the office when I got there.

Q Okay. So you went from home to office?

A Yes.

How'd that call go?

A That's when I started getting a little bit more history about hope. So she told me that she was in our custody. She's been on runaway status. And that she also got the call from Socorro Police Department from their sergeant, if I remember correctly.

Q Okay. So, now the term runaway status. What does that mean?

A When a juvenile gets called in as a runaway.

Q What does -- what does the word runaway mean now in this context? Do you have any understanding of it?

A Running away from whoever has custody of that juvenile.

Q Okay. So leaving whatever foster placement they're at?

MR. CARRILLO: Objection. Form. You can go ahead and answer.

THE WITNESS: Well, I mean, it just doesn't come, like, just for us. Like, also, like if a child leaves their home, their parents can call. That child does a run away. They would be considered a runaway status. So wherever the child

runs from there.

BY MR. GUBERNICK:

Q Okay. I think I see --

A (Crosstalk) custody. Yeah.

Q All right. And Hope Waggoner had an open abuse and neglect case, right, to your knowledge? Did you -- did you have any understanding about whether or not Hope Waggoner was in CYFD custody?

A Yes.

Q She was?

A Yes.

Q Okay. If I recall your probable cause affidavit, you mentioned something about Hope Waggoner having a caseworker?

A Yes.

Q Who's that?

A It was Hannah Duron.

Q Okay. Do you know Hannah, or did you know Hannah Duron at the time?

A Yes.

Q How well did you know her?

MR. CARRILLO: I'm going to object to the form of the question as vague, but you can answer as best you're able.

THE WITNESS: We've been working together

A Ms. Elias, or I believe it's pronounced Ms. Elias. She's the -- she was the victim's advocate.
Q So I think you're answering a different question than I asked. So prior to -- prior to arriving at the court, I just want to make sure we've exhausted the list of people you talked to about this case. And you mentioned the first call you got when you were at home at like 5:00 a.m., and then the second call with the on-call permanency supervisor. Are those the only two calls? Are those the only two communications you have with people like that in the emailed over report? Are those the only -- are those the only three communications you had with people about Hope Waggoner prior to arriving in Socorro?
A From what I recall, yes.
Q Okay. So you get this -- okay. So you get to -- you get to the Socorro Police Department, you're just parked in the parking lot?
A Yes, I parked out front.
Q All right. Walk in the door?
A Yes.
Q Who do you talk to then?
A That's when I believe I talked to Mr.

anybody at the Socorro Police Department?
A No.
Q Okay. How about your car? Doesn't have any -- I'm assuming it doesn't have any recording equipment in it?
A No.
Q To your knowledge?
A Yeah.
Q I mean, I know it could be that there's, like, someone spying on you, but to your knowledge, there's nothing?
A To my knowledge, no.
Q Okay, I understand. All right. So you talked to the -- the victim advocate. Was she wearing a body camera, too? Well, actually, do you recall was she wearing, like, a police uniform?
A As I recall, she did not.
Q Okay. So, do you recall she was or was not wearing a police uniform?
A As I recall, she wasn't.
Q Okay. And do you recall seeing a body camera or anything like that?
A As I recall, she did not.
Q Okay. So you talked to her? Who else did you talk to?

A I believe the next person I talked to was Hope.
Q All right. So is Hope, like, brought out into the lobby?
A No, I went towards the back and met with Hope. Ms. Elias is the one that walked me over.
Q The victim advocate?
A Yes.
Q Okay. So you got walked over to Hope?
A Yes.
Q All right. So, where physically were you in the building when you first made contact with Hope? Like a back room or a hallway or what?
A Yeah, it was a small back room in the station.
Q Okay. Who else was there?
A I believe it was just me, Hope, V.T., and Ms. Elias.
Q Okay. When did you later know that -- or when did you come to learn that there was a baby -- that Hope had a baby with her?
A When I got the report.
Q Okay. And that's the report you printed out?
A Yes.

Q Okay. Prior to arriving at the Socorro Police Department, had you been -- had anyone directed or asked you or given you any instructions at all related to the baby that was with Hope?
A Yes. Me and my on-call supervisor, Claudia, did discuss that it was only Hope that was under custody, so we didn't -- we needed to get consent before bringing Valeria with her.
Q So Claudia is the only person you talked to, or did you talk to -- also talk to -- did you talk to anybody else about it before you got to Socorro?
A About that?
Q About her.
A No. I believe it was just me and Claudia.
Q Okay. Now, the victim advocate, Elias. I think you said Elias.
A Elias.
Q Elias.
A Yeah.
Q Okay. What did -- did she say anything about her?
MR. CARRILLO: Objection to the form of the question.
BY MR. GUBERNICK:

Q I'm sorry, did she say anything about the baby, who was with her?
MR. CARRILLO: Same objection.
THE WITNESS: No, just that she came to the station after that incident, that she had the -- that morning or night. I guess it'd be considered early morning after midnight.
BY MR. GUBERNICK:
Q Did you receive any instructions or requests from Texas CPS or anyone at the Socorro police departments to take custody of the baby that was with Hope?
A No.
Q All right. How long did you talk to Hope in this -- this -- this room back of the lobby before you left?
A Not much. I think I just introduced myself, and that's when I asked for the consent to take her baby with her since I had to bring her back to New Mexico.
Q What were the exact words you used to ask for this consent?
MR. CARRILLO: Objection. Form. Answer as best you can.
THE WITNESS: I believe I just said, you

know, is okay if we, you know, bring Valeria along with us. I had to take her back when she was in custody.

BY MR. GUBERNICK:

Q What option did she have?

MR. CARRILLO: Objection. Form. Foundation. Asking the witness to speculate.

MR. GUBERNICK: I've asked that you make your objection. He's got to answer the question. What option did she have?

MR. CARRILLO: Same objection.

THE WITNESS: I mean, no options were really brought up.

BY MR. GUBERNICK:

Q What options did she have?

MR. CARRILLO: Question has been asked and answered, Counsel.

BY MR. GUBERNICK:

Q You said that none were brought up. Were there any that she had that weren't brought up?

MR. CARRILLO: Objection. Form. Foundation.

MR. GUBERNICK: You've made your objection.

BY MR. GUBERNICK:

the question.
THE WITNESS: Can you repeat that again?
BY MR. GUBERNICK:
Q By bringing the baby with her, she consented?
A She gave consent once I asked her if she wanted to bring her along.
Q Okay. What exactly did you say?
A That if it is okay, we can bring Valeria with us.
Q What did she say in response?
A She said that, yes, she wouldn't be leaving without her baby.
Q Okay. So her choice was either to bring the baby with her or leave the baby at the police department?
MR. CARRILLO: Objection to the form of the question.
BY MR. GUBERNICK:
Q Is that what you're saying?
MR. CARRILLO: Objection to the form of the question.
THE WITNESS: Can you repeat that again?
BY MR. GUBERNICK:
Q So was the choice between bring the baby

what?
A Yes. I opened the trunk to let Ms. Elias and I kind of help her put the items in the trunk. And then Hope is putting the baby in the car, strapping her in.
Q Okay. Talk to Hope at all during that period?
A During that period, no.
Q Yeah. I'm sorry what?
A During that period, no.
Q Okay. So the only conversation you had with her was in that room behind the lobby?
A Yes.
Q Okay. Where -- where was Hope sitting in the car?
A In the back seat.
Q Was there a car seat back there for V.T?
A She was already in a carrier, and then that got strapped into the car.
Q Yeah, I guess that's what I meant. It's one of those carriers you can strap into the --
A Yes. Yeah.
Q Okay. Did you talk to anybody else before leaving the parking lot?
A I did talk to my supervisor. And it was

during that time that Hope was still in the -- still in the building. I talked to my on-call supervisor, letting -- letting her know that I got the consent and that we were going to start heading on the way back to Las Cruces.

Q Who was -- who -- was this the same on-call supervisor you talked to before?

A Claudia Cabazos, yes.

Q Okay. All right. Why not just drop the kid off with dad?

MR. CARRILLO: Objection. Form.

THE WITNESS: I mean, again, the -- that option was not brought up.

BY MR. GUBERNICK:

Q It never crossed your mind, or just wasn't brought up?

MR. CARRILLO: Objection. Form. Asked and answered.

THE WITNESS: It just was not brought up.

BY MR. GUBERNICK:

Q Do you know the penalties to lying under oath?

A I do not.

Q Okay. Do you know what's a felony offense?

MR. GUBERNICK: Okay. I understand that. Major objection.
BY MR. GUBERNICK:
Q What did you talk with Hope about, if anything, after you got in the car and on the drive back to Las Cruces?
A We just talked about the incident that had happened, making sure that she was okay, and then she did mention that she was going to head back to Texas at some point.
Q She mentioned she's going back to Texas?
A Yes.
Q Okay. Did you understand that she'd been living with Jaime in Texas for some time?
MR. CARRILLO: Objection. Form.
THE WITNESS: At that point, no.
BY MR. GUBERNICK:
Q Okay. I'm going to represent to you that when Hope testified in deposition the other day, she said she told you that she wanted to drop V.T. off with dad. And she asked you, can we drop V.T. off with dad? And that you said that wasn't an option. Here's my question to you. Is she lying?
MR. CARRILLO: Objection to the form of the question.

THE WITNESS: Yes, she is.
BY MR. GUBERNICK:
Q When did -- did you ever tell Hope that V.T. was going to be taken into CYFD custody?
A No.
Q When did you decide to take Hope into CYFD custody?
MR. CARRILLO: Objection to the form of the question.
THE WITNESS: Can you repeat that?
BY MR. GUBERNICK:
Q We'll get back to it. Did you talk about anything else on the drive up to Las Cruces?
A No. Mostly I just stay, listen to my music. We did stop at a gas station so she could use the restroom, but that was pretty much it.
Q Okay.
THE REPORTER: I'm sorry. I just lost -- lost visual and audio. Can anybody hear me?
MR. GUBERNICK: Yeah, I can hear you. I was -- yeah. Are you there?
THE REPORTER: Yes. The screen went blank.
MR. GUBERNICK: Yeah. Oh, yeah. So where's the -- where's the video?
THE REPORTER: Would you like to go off

the record? I'm sorry.

MR. GUBERNICK: I don't know. The camera just turned itself off.

THE REPORTER: Okay. It's off again.

MR. GUBERNICK: Yeah. It's having -- you know, we're keeping it on. Can we -- are you okay like this?

THE REPORTER: Yes. It's on now. As long as I can hear you, I think we'll be okay.

MR. GUBERNICK: As long as the audio is not having any issues. I don't know if it's the internet connection or what.

BY MR. GUBERNICK:

Q Okay. So, the permanency supervisor you talked to, what's her name?

A Cynthia Galvan.

Q Okay. Did you ever discuss with her taking V.T. into CYFD custody?

A No.

Q Okay. So you get to the office -- or let me ask you, do you get back to the office in Las Cruces that you left from?

A Yes.

Q Okay. Where do Hope and V.T. go at that point?

MR. CARRILLO: Objection. Form. Foundation. You can answer.

THE WITNESS: If I remember correctly, they went with the permanency worker. And then there were discussions of where they were going to be placed from that point.

BY MR. GUBERNICK:

Q Were you part of those discussions?

A No. Those discussions are only usually made with placement.

Q Then how do you know those discussions happened?

MR. CARRILLO: Objection to the form of the question.

THE WITNESS: Because of -- I was talking to my supervisor and we're trying to decide, like, where are they going to be placed? Because I do have to open placement on my end.

BY MR. GUBERNICK:

Q Okay.

A The ones that find the home.

Q Open placement. What do you mean by that?

A Like, show that they're placed in the resource one.

Q Why did V.T. have to be placed anywhere?

Q Why? Why were you investigating that incident?
A Because on the report, it was -- Hope was the perpetrator and V.T. was the victim.
Q Okay. Why were -- you know, that wasn't my question to you. Why were you investigating it?
MR. CARRILLO: Objection to the form of the question. The witness was answering. Please go ahead.
BY MR. GUBERNICK:
Q Do you have an answer?
A Yes. Because on the report, that's what I was trying to investigate. That was just part of my investigation.
Q Investigation into what?
A If abuse and neglect happened.
Q If V.T. had been abused and neglected?
A Yes.
Q Okay. So when did you start this investigation?
A When I got back to the office.
Q Who told you to start this investigation?
A Supervisor.
Q Who?
A Claudia Cabazos.

Q Was Jaime angry?
MR. CARRILLO: Objection. Form.
BY MR. GUBERNICK:
Q Did he sound angry?
MR. CARRILLO: Same objection.
THE WITNESS: I don't really recall the tone of his voice.
BY MR. GUBERNICK:
Q Did he yell, or no recollection?
A Not that I recall, no.
Q Okay. Who else did you talk to in your investigation?
A I also talked to Hannah Duron. To get a little bit more background, I did call Natalia Figueroa. She was the victim in the incident that had happened.
Q Did you call Texas Child Protective Services?
A Not at that point, no.
Q Why not?
A At that point, I was just -- again, during my investigation, I was trying to see where I needed to kind of go from there.
Q Okay. So you were investigating an incident of suspected child abuse that occurred in