EXHIBIT 14





IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

| | |
|---|---|
| HOPE WAGGONER and JAMIE TORRES, as individuals and on behalf of V.T., a minor, | ) |
| Plaintiffs, | ) |
| v. | ) No. 3:25-cv-00166-RFC |
| THE NEW MEXICO CHILDREN, YOUTH & FAMILIES DEPARTMENT and JACOB TORRES, in his individual capacity, | ) |
| Defendants. | ) |

ORAL DEPOSITION OF
LORENZA ELIAS
MAY 5, 2026

The Oral Deposition of LORENZA ELIAS, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on Tuesday, May 5, 2026, from 8:34 a.m. to 10:43 a.m., in and for the State of Texas, reported by machine shorthand, at 501 East Main Street, El Paso, Texas 79901, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Stenographically Reported By:

Suzette Ramirez



04af5cb1-2e6e-4bb9-abfa-3d6400b492bb

THE REPORTER: Good morning. My name is Suzette Ramirez, stenographic reporter.

Today's date is May 5, 2026. The time is 8:34 a.m. Mountain Standard Time.

We are at the offices of Rasberry & Associates, located at 501 East Main Street, El Paso, Texas 79901, for the deposition of Ms. Lorenza Elias.

Will all persons present please state their appearances and whom they represent and then I will swear in the witness.

MR. GUBERNICK: Ben Gubernick and I represent the plaintiffs.

MR. CARRILLO: Raul Carrillo on behalf of the State of New Mexico and Department of Children, Youth & Families and Jacob Torres.

LORENZA ELIAS,

having been duly sworn by the Stenographic Reporter, testified as follows:

EXAMINATION

BY MR. CARRILLO:

Q. Good morning, Ms. Elias.

**A. Good morning.**

Q. Thank -- thank you for appearing here today.

We have now gone on the record and you have been sworn to tell the truth, the whole truth and

nothing but the truth.

So all of that can seem very intimidating, but you told me before the deposition this isn't the first time you've done this. Correct?

**A. Yes, sir.**

Q. Okay. Thank you.

And is it more appropriate to refer to you as Officer Elias?

**A. No. I'm no longer an officer. I'm the crime victim advocate for the Socorro Police Department.**

Q. Okay. Were you at one point in time a police officer?

**A. Yes, sir.**

Q. And in Texas, do they call that a certified law enforcement officer?

**A. Yes, sir.**

Q. So CLEO, I think. Right?

**A. TCOLE.**

Q. TCOLE.

What does that stand for?

**A. The Texas --**

Q. Do you remember?

**A. No, it's been a while.**

Q. It's been a while.

**A. It's been six years so...**

I'm just joking.

How long did you stay in Midland?

**A. About six years, with my sister.**

Q. You were there a long time.

Patrol officer?

**A. Yes.**

Q. Okay. What was your job title when you left?

Was it still patrol?

**A. Yes.**

Q. Okay. Six years.

Where'd you go after Midland?

**A. I moved back here to El Paso and started working at Socorro ISD again as a peace officer.**

Q. And how long did you stay at Socorro ISD?

**A. A little over five years.**

Q. Okay. And next job?

**A. Then I started at Socorro -- the City of Socorro, the police department there. And I've been the crime victim advocate for six years.**

Q. So you started as crime victim advocate and are still crime victim advocate?

**A. Yes, sir.**

Q. Okay. For the benefit of the ladies and gentlemen of the jury, could you please explain for them, because they may not know, what does a crime

**traffic.**

Q. Okay. So you think you would have arrived between 7:45 and 8:05 on the morning of the 21st?

**A. Well, before 8:00.**

Q. Before 8:00 --

**A. Yes.**

Q. -- for sure. Okay.

**A. For sure.**

Q. All right. So from the time that you arrived until Hope was gone from the facility, did you ever interact with Jaime?

**A. No.**

Q. So you never got a chance to make an independent assessment of him?

**A. Jaime, no.**

Q. Do you even know whether Jaime was there?

**A. No.**

Q. Do you know whether Jaime's dad, Jaime Sr., was there?

**A. No.**

Q. Do you know whether Hope had any other transportations available to her?

**A. She had --**

**I think that was one of my questions and she said that she was with who I at that time thought**

**that was the aunt.**

Q. Okay. And do you know if Hope was in contact with the baby's father?

**A. During my interaction with her?**

**No.**

Q. Yes.

**A. I believe she didn't have a phone.**

Q. Did Hope ever ask you to take the baby to her father?

**A. No.**

Q. Did Hope ever indicate to you that she wanted the baby to go with her father?

**A. No.**

Q. Okay. I understand she was frustrated and thought that this was ridiculous, dumb. And that seems like the perfect time to say, "If I have to go to New Mexico, leave the baby with her father."

Did she say anything like that?

MR. GUBERNICK: Object, form.

**A. No.**

Q. (BY MR. CARRILLO) Okay. Did she ever make a request to you that the baby should stay in El Paso?

**A. No.**

Q. Okay. During your interactions with Hope, did you observe her interaction with Jacob Torres, the CYFD



04af5cb1-2e6e-4bb9-abfa-3d6400b492bb

**the report to kind of see what the situation was.**

**But my -- my encounter with Hope was minimum, so I didn't really --**

Q. Okay. In your own words, what's your understanding of what this -- what this lawsuit is about?

**A. The lawsuit itself --**

Q. Yeah.

**A. -- I'm not sure. I wasn't sure if it was either -- which party was going against which party. I thought it was more like the criminal portion of it.**

Q. Okay.

All right. I'm gonna represent to you that the -- the plaintiffs in this case are Hope Waggoner, Jaime Torres and the baby, Valeria, and that they're suing CYFD and Jacob Torres for essentially kidnapping their baby.

**A. Okay.**

Q. Did you know anything about that prior to today?

**A. No.**

Q. Okay. So around what time did you get to the Socorro Police Department that day?

**A. It's about 7:45-ish. Before 8:00.**

Q. Okay. And about how long would you say went by



04af5cb1-2e6e-4bb9-abfa-3d6400b492bb

before Jacob Torres arrived?

**A. Maybe half an hour.**

Q. Okay. So where were you for that half an hour before he arrived?

**A. It was in -- that was in the building or talking with Hope.**

Q. Okay. So "in the building," what do you mean by that?

**A. My office was directly across from where Hope is.**

Q. Okay. So how many minutes would you say you spent in the same room as Hope?

**A. Maybe five, no more than 10.**

Q. Okay.

All right. So you said you had --

Do -- do you have any knowledge of anything anybody --

Well, actually, let me ask it -- ask the question like this.

So she -- your -- your office was across from the room where her -- she was?

**A. Yes.**

Q. And what's her -- what -- what room was she in again?

**A. She was in the -- well, then**

Q. Did you perceive that she was incapacitated by alcohol?

**A. No.**

Q. Did you perceive that she was incapable of taking care of her child?

**A. No.**

Q. Did you perceive that she was incapable of expressing her wishes with regard to her child?

**A. Yes.**

Q. Okay. Why do you think she was incapable of expressing her wishes?

**A. Oh, I mean I thought you said "capable."**

**Yes. She --**

Q. Okay.

**A. Yeah.**

Q. So she was able to look after her baby.

**A. Yes.**

Q. And in fact was looking after her baby.

**A. Yes.**

Q. And did you see any reason to distrust her?

**A. No.**

Q. And you've testified earlier today that Hope never told you that she didn't want the baby to go to New Mexico.

**A. That's correct.**



04af5cb1-2e6e-4bb9-abfa-3d6400b492bb